FRANK L. LEVY, ET AL.,[1] PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 1132-85—1134-85.     Filed November 2, 1988.

*Graham Stafford* and *Steven I. Klein,* for the petitioners.
*Gary F. Walker,* for the respondent.

SWIFT, *Judge:* In timely statutory notices of deficiency dated October 12, 1984, respondent determined the following deficiencies in petitioners' 1980 and 1981 Federal income taxes:

| Petitioner | Docket No. | Year | Deficiency |
|---|---|---|---|
| Frank L. Levy | 1132-85 | 1980 | $31,682 |
| | | 1981 | 79,237 |
| Lee & Leon Oil Co. | 1133-85 | 1980 | 69,173 |
| | | 1981 | 179,807 |
| Samuel A. Levy | 1134-85 | 1980 | 32,223 |
| | | 1981 | 78,979 |

---

[1]Cases of the following petitioners have been consolidated herein: Lee & Leon Oil Co., docket No. 1133-85, and Samuel A. Levy, docket No. 1134-85.

After concessions, the issues for consideration are: (1) Whether petitioners' investment in computer equipment was a sham transaction devoid of economic substance; (2) whether ownership of the computer equipment was transferred to petitioners; (3) whether petitioners were at risk within the meaning of section 465[2] with respect to debt obligations they incurred in connection with the transaction; and (4) whether petitioners' investment constituted an activity entered into for profit within the meaning of section 183.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. Petitioner Lee & Leon Oil Co. (Lee & Leon Oil) was incorporated under the laws of Louisiana on January 1, 1959. Lee & Leon Oil was engaged in the business of selling and distributing equipment and supplies relating to offshore oil and gas drilling. It sold to such companies as Exxon, Texaco, Mobil, and Amoco, and was one of the largest Shell jobbers in the country. Lee & Leon Oil maintained its principal business office in Metairie, Louisiana, and it used the accrual method of accounting for tax purposes during the years in issue.

Petitioners Frank L. Levy and Samuel A. Levy are brothers and are, respectively, president and vice president of Lee & Leon Oil. Each owned 50 percent of the common stock. Frank Levy resided in New Orleans, Louisiana, and Samuel Levy resided in Lacombe, Louisiana, at the time their petitions were filed. Frank and Samuel Levy each used the cash method of accounting for tax purposes during the years in issue. All petitioners timely filed Federal income tax returns for 1980 and 1981.

In 1979, because of concerns over the cyclical nature of the oil business, Frank and Samuel Levy decided to diversify their company and their personal investments by means of a long-term investment outside the oil industry. In early 1980, they asked their financial adviser, David Kushner, to investigate investment alternatives. After evaluating numerous types of investments, Mr. Kushner ad-

---

[2]Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954 as in effect during the years in issue.

vised Frank and Samuel Levy that equipment leasing represented a viable investment alternative. After considering specific investment recommendations of Mr. Kushner, Frank and Samuel Levy, and Lee & Leon Oil purchased certain IBM computer equipment on December 23, 1980. On that day, they also leased the equipment back to an unrelated company.

The controversy in these consolidated cases arises out of respondent's disallowance of deductions claimed on petitioners' Federal income tax returns for the years in issue with respect to this investment. Respondent disallowed depreciation and interest expenses and decreased rental income relating to petitioners' investment as follows:

FRANK L. LEVY—DOCKET NO. 1132-85

|  | 1980 | 1981 |
|---|---|---|
| Depreciation | $70,353 | $88,592 |
| Interest expense | - - - | 69,124 |
| Rental income | - - - | (1,425) |

LEE & LEON OIL CO.—DOCKET NO. 1133-85

|  | 1980 | 1981 |
|---|---|---|
| Depreciation | $150,375 | $255,637 |
| Interest expense | - - - | 138,248 |
| Rental income | - - - | (3,000) |

SAMUEL A. LEVY—DOCKET NO. 1134-85

|  | 1980 | 1981 |
|---|---|---|
| Depreciation | $70,353 | $88,592 |
| Interest expense | - - - | 69,124 |
| Rental income | - - - | (1,425) |

## Equipment Purchased

Petitioners purchased an IBM model 3033-N8 central processor and peripheral equipment consisting of a 3036-1 console and a 3037-1 power and coolant unit. The 3033 line of IBM mainframe computers was first announced in March of 1977. The 3033-N8 model was first announced in November of 1979 and became commercially available in 1980. At that time, it was regarded as IBM's latest, top-of-the-line mainframe computer and represented an evolutionary improvement in IBM mainframe computers. Because of high demand, purchasers had a minimum waiting period of 90 days for delivery of new 3033-N8 computers.

In late 1981 or early 1982, IBM announced the 3083 H-series of mainframe computers and discontinued further production of new 3033-N8 central processors. By late 1982 or early 1983, IBM discontinued marketing new 3033-N8 models.

In 1984, IBM announced the 3090 model of mainframe computers. The 3090 model represented the first revolutionary change in IBM mainframe computers from the IBM 370 series. The announcement and subsequent production of the 3090 model caused a drastic and unexpected reduction in the then-current fair market value, the residual value, and the useful life of IBM 3033-N8 mainframe computers.

The mainframe computers IBM had developed in the 1960's and 1970's (referred to generically as the 360 and 370 series) generally had experienced economic useful lives of approximately 15 and 10 years, respectively.[3]

## DPF, Inc., and AARK Enterprises

The independent leasing company involved in the transaction at issue in this case is DPF, Inc. DPF began purchasing and leasing equipment in 1964. Through 1980, DPF had leased to end-users equipment with a total value of $750 million. In 1980, DPF was a publicly owned company listed on the New York stock exchange. It had gross revenues in that year in excess of $600 million, of which $45 million was related to its leasing activities. It owned $320 million in assets of which $150 million was equipment leased to end-users.

Initially, DPF's leasing business involved traditional third-party leasing. DPF purchased new equipment from manufacturers, retained ownership of the equipment, and leased it to other companies. In 1977, however, DPF purchased a baking business for $42 million in cash which reduced its available cash to support its leasing activities. In order to recover a portion of the capital invested in its leasing business, DPF investigated entering into multiple-party sale-leaseback transactions, in lieu of direct third-party leasing. In a multiple-party sale-leaseback transaction, DPF would sell to investors its equity position in equipment it

[3]A more detailed description of the history of IBM mainframe computers is found in *Gefen v. Commissioner,* 87 T.C. 1471, 1486-1487 (1986).

had purchased and leased to end-users. The investors would immediately lease the equipment back to DPF which would continue leasing the equipment to end-users.

Multiple-party sale-leaseback transactions appeared attractive to DPF in 1980 because, in such transactions, DPF would recapture quickly its capital investment in the leasing-related equipment it purchased. DPF also had the potential to earn a profit through remarketing the equipment to subsequent end-users, and DPF would maintain its customer base through continued direct contact with end-users even though it no longer owned the equipment. DPF decided to pursue multiple-party sale-leaseback transactions with a company by the name of AARK Enterprises (AARK).

AARK was formed in 1977 by Raymond Kenard as a joint venture of two existing corporations. AARK was formed for the purpose of arranging sale-leaseback transactions of equipment owned by leasing companies and already on lease to end-users. Generally, AARK would purchase the equipment from leasing companies, resell the equipment to corporate or individual investors, and assign its rights in the existing end-user leases of the equipment to the investors. After arranging such transactions, AARK did not remarket, re-lease, or repurchase the equipment. Its continuing role in the transactions was to pay off its debt obligations to the leasing companies and to collect payments from the investors on their debt obligations to AARK. From 1977 to 1980, AARK's participation in such multiple-party sale-leaseback transactions produced approximately $200 million in income.

*The Transaction in Question—DPF's Purchase of Computer Equipment*

In May 1980, DPF purchased from IBM a model 3033-N8 IBM mainframe computer and peripheral equipment and leased it to Bristol-Myers Co. DPF paid $2,005,000 for the computer equipment. DPF made a cash downpayment and borrowed $1,777,918 from Manufacturers Hanover Leasing Corp. (MHLC) in order to finance the purchase of the computer equipment from IBM.

The $1,777,918 loan MHLC made to DPF was evidenced by two promissory notes, one in the amount of $269,481.38 and

one in the amount of $1,508,436.62. The loan was to be repaid in 84 installments as follows: 47 monthly payments of principal and interest in the amount of $45,513.50, followed by 37 monthly payments of principal and interest in the amount of $9,109. The $269,481.38 promissory note provides that MHLC has full recourse to proceed directly against DPF for any deficiency or other sum owed with respect to the $269,481.38 promissory note.

DPF's $1,508,436.62 promissory note to MHLC was labeled nonrecourse except as otherwise provided in section 19 of the related loan and security agreement (the L and S agreement) between MHLC and DPF. Section 19 of the L and S agreement provides that with respect to the $1,508,436.62 promissory note of DPF, MHLC has full recourse against DPF and against its assets and properties for all damages, losses, costs, and expenses incurred by MHLC to the extent DPF "defaults" in the performance of, or fails to comply with certain other obligations set forth in section 19 of the L and S agreement. Among the obligations referred to in section 19 of the L and S agreement which trigger the full recourse liability of DPF are the following:

12. *Default.* In the event:

(a) of any failure of [DPF] to pay any amount when due hereunder for a period of 10 days after notice to [DPF] by MHLC; or

(b) of any material failure by [DPF] to perform any agreement under this Agreement or under any other agreement or document referred to herein, given to evidence or secure any of the Secured Obligations or under any of the Assigned Documents beyond any applicable grace period provided for therein and such failure continues to remain unremedied for a period of 10 days after notice to [DPF] by MHLC; * * *

Each of DPF's promissory notes to MHLC was secured by written security agreements in favor of MHLC covering the IBM 3033-N8 mainframe computer and peripheral equipment. In addition, under the L and S agreement between DPF and MHLC, any sale or transfer of the equipment by DPF required written consent of MHLC and any ownership interest of subsequent owners of the equipment was subordinate to the security interest of MHLC.

Based on the above provisions of the L and S agreement between DPF and MHLC, the debt obligations of DPF under

its $1,508,436.62 promissory note to MHLC represent full recourse obligations of DPF.

*Sale by DPF of IBM Computer Equipment to AARK*

On December 22, 1980, DPF sold to AARK the IBM model 3033-N8 computer and peripheral equipment that it had purchased from IBM in May 1980 and that it had financed through the MHLC loan.

The terms of the sale from DPF to AARK were set forth in a written purchase agreement. The total purchase price was $2,005,000 (the same amount DPF paid to IBM for the equipment 8 months earlier). AARK made a $30,075 cash downpayment, and AARK gave DPF a $1,974,925 promissory note. In addition, at the close of the transaction, AARK prepaid $250,625 in interest on the promissory note that would accrue during the first 18 months of the loan. AARK's promissory note, dated December 22, 1980, was a full recourse installment promissory note. The note bore interest at 12.85409834 percent per year and was payable in monthly installments in the amount of $33,763.44 for 102 months (namely, in the 19th through the 120th months following the close of the transaction).

AARK's promissory note sets forth AARK's rights and remedies in addition to its recourse liability. AARK's rights include the right of setoff for any liabilities DPF may have to AARK and the right to defer payment of principal and interest on the note as such payments become due if and to the extent DPF fails to discharge its debt obligations to MHLC. Any such deferred payments were to become due and payable without interest when DPF discharged its indebtedness to MHLC. In addition, if DPF's note payments to MHLC were not paid when due, AARK was authorized to make the payments to MHLC on behalf of DPF. Any amounts paid by AARK to MHLC under this provision are deemed to have been paid to DPF, resulting in a reduction in the amount of principal and interest due on the recourse note between AARK and DPF. AARK's indebtedness to DPF was secured by a security interest in the IBM computer in favor of DPF which was subordinate to the security interest of MHLC.

Generally, when structuring multiple-party sale-leaseback transactions, AARK's objective was to comply with the

leveraged lease guidelines published by the Internal Revenue Service. AARK informed leasing companies that the equipment to be sold must have a projected residual value (as of the date of the sale-leaseback transaction) of at least 20 percent and that the leasing company must supply AARK with an appraisal by an independent appraiser establishing the projected residual value. AARK, in turn, would furnish information about the projected residual value of the equipment to potential investors. In addition, AARK furnished potential investors cash-flow projections to illustrate that their profits depended upon the projected residual value of the equipment and, if applicable, the amount of rent participation potential investors would receive from leases with end-users. AARK did not guarantee investors that the residual values or rent-participation figures projected at the time the sale-leaseback transactions were entered into would be realized.

In general, AARK's profit in sale-leaseback transactions was based on the difference between the cash downpayment (including the amount of prepaid interest) AARK paid to the leasing companies and the cash downpayment (including the amount of prepaid interest) investors paid to AARK. In addition, AARK structured the debt obligations in these transactions so that the monthly payments from the investors to AARK were approximately equal to AARK's monthly obligations to the leasing companies.

*Sale by AARK of IBM Computer Equipment to Petitioners, Lease to DPF, and Remarketing Agreement*

As explained above, petitioners' financial adviser, Mr. Kushner, investigated various long-term investments to recommend to petitioners. Using information supplied by AARK in order to evaluate whether the investment likely would be profitable to petitioners, Mr. Kushner prepared a cost-benefit analysis of a particular investment offered by AARK that involved the leasing of computer equipment. In his analysis, Mr. Kushner included a projected residual value for the equipment in 1990 and an estimated dollar amount for rent participation for the years 1986 through 1990. Mr. Kushner also prepared an alternate analysis showing no residual value for the equipment in 1990. The

residual value used by Mr. Kushner in the cost-benefit analysis was obtained from an appraisal of the equipment completed in December 1980 by an independent appraiser employed by AARK.

Petitioners reviewed the cost-benefit analysis completed by Mr. Kushner and decided that the investment required further investigation. At that time, petitioners retained the services of a reputable law firm with expertise in handling leasing transactions to review the transaction and to investigate the financial status of each of the business organizations involved in the transaction. In particular, because of the amount of money involved, Mr. Kushner wanted to verify that AARK and the participating leasing company were creditworthy and could pay their obligations under the proposed transaction. Mr. Kushner, therefore, requested financial statements from each of the companies that were to be involved in the transaction.

Upon reviewing the financial statements, petitioners were satisfied with AARK's financial status but they were not satisfied with the financial status of the leasing company proposed by AARK that was to be involved in the transaction. Petitioners decided not to pursue the investment at that time, but informed AARK of their continuing interest in such an investment but with a different leasing company.

AARK revised the investment proposal by substituting DPF as the leasing company. The dollar amounts of the investment and the type of equipment remained similar to that initially proposed. After investigating DPF, petitioners were satisfied that both AARK and DPF were creditworthy. Petitioners then entered into the multiple-party, purchase-leaseback transaction with AARK and DPF that is at issue in this case.

On December 23, 1980, petitioners purchased from AARK the IBM model 3033-N8 mainframe computer and peripheral equipment AARK had purchased from DPF. The equipment was purchased for a total purchase price of $2,005,000, which was the same amount AARK had agreed to pay DPF for the equipment and the same amount DPF had paid IBM for the equipment. Frank and Samuel Levy each purchased a 25-percent interest in the equipment, and Lee & Leon Oil purchased a 50-percent interest.

Under the terms of the transaction, petitioners made a cash downpayment of $64,677 and executed promissory notes in favor of AARK in the total amount of $1,940,323. The promissory notes bore interest at 15 percent per year and were payable in 102 monthly installments of $33,763.44 beginning in the 19th month and ending in the 120th month after closing. Interest on the installment notes that accrued during the first 18 months after closing was to be deferred and paid on June 15, 1981, and June 15, 1982. Petitioners' allocable share of the total purchase price, cash downpayment, promissory notes, and monthly payments on the promissory notes are reflected below:

| Petitioners' percent of interest purchased | Purchase price | Cash downpayment | Promissory note | |
|---|---|---|---|---|
| | | | Principal | Payments |
| Frank Levy—25% | $501,250 | $16,169 | $485,081 | $8,440.86 |
| Samuel Levy—25 | 501,250 | 16,169 | 485,081 | 8,440.86 |
| Lee & Leon Oil—50 | 1,002,500 | 32,339 | 970,161 | 16,881.72 |
| Total—100 | 2,005,000 | 64,677 | 1,940,323 | 33,763.44 |

The installment note each petitioner signed was labeled a full-recourse promissory note. Each note contains language which imposes personal liability on petitioners in the event they fail to make the required note payments to AARK. In addition, each note contains a discharge provision in the event AARK fails to discharge its debt obligations to DPF and to MHLC. If AARK fails to discharge its obligations to DPF or to MHLC, the principal and interest on the notes between petitioners and AARK are reduced by the amount of the loan payments AARK fails to discharge.

At the close of the transaction, petitioners paid $60,151 of the required $64,677 cash downpayment[4] and executed two recourse "subscription" notes in favor of AARK reflecting the accrued interest due on June 15, 1981, and June 15, 1982. Each of the subscription notes was secured by irrevocable bank letters of credit. Each subscription note bore interest at the rate of 13 percent. Each petitioner's allocable share of the cash paid at closing and of the two subscription notes is as follows:

---

[4]The record does not adequately explain how or whether the $4,526 balance of the cash downpayment was paid.

| Petitioners | Cash paid at closing | Subscription notes | |
| --- | --- | --- | --- |
| | | Note 1 | Note 2 |
| Frank L. Levy | $15,038 | $58,646 | $51,629 |
| Samuel A. Levy | 15,038 | 58,646 | 51,629 |
| Lee & Leon Oil Co. | 30,075 | 117,292 | 103,258 |
| Total | 60,151 | 234,584 | 206,516 |

After purchasing the equipment, petitioners Frank and Samuel Levy each sold 1.25 percent of their respective interests in the equipment to their investment adviser, Mr. Kushner, and to a friend of his. In addition, Mr. Kushner negotiated a rebate in the amount of $14,703 from AARK. The rebate was used to reduce the purchase price of the investment for petitioners, Frank and Samuel Levy, and apparently for the owners of the 2.5-percent interest.

Petitioners' total investment and ownership interests in the equipment were as follows:

| | Total investment | Investors and percentage of ownership | | |
| --- | --- | --- | --- | --- |
| | | Lee & Leon Oil (50%) | Frank Levy (23.75%) | Samuel Levy (23.75%) |
| Purchase price | $2,005,000 | $1,002,500 | $501,250.00 | $501,250.00 |
| Less: | | | | |
| Rebate | (14,337) | - - - | (7,168.50) | (7,168.50) |
| Sale of 2.5% | (50,125) | - - - | (25,062.50) | (25,062.50) |
| Total | 1,940,538 | 1,002,500 | 469,019.00 | 469,019.00 |

For convenience, petitioners Frank and Samuel Levy's interests will be treated hereinafter as 25-percent interests.

The purchase agreement between petitioners and AARK provides that petitioners' interests in the computer equipment are subordinate to the interests of MHLC, DPF, and AARK. Petitioners did not directly assume any of AARK's obligations to DPF or any of DPF's obligations to MHLC. Petitioners did sign, however, a recognition agreement with DPF. Under the recognition agreement, DPF agreed to give petitioners written notice of AARK's failure to make any payment on its indebtedness to DPF. Petitioners have 30 days from the time they receive such notice to notify DPF that they will assume AARK's obligations and that they intend to make the required payments directly to DPF. In addition, the recognition agreement provides that petitioners' right to cure AARK's default is absolute, and that DPF waives any right or remedy it has against AARK until notice

is given to petitioners and the 30-day time period for petitioners to cure AARK's default has expired.

Also on December 23, 1980, the same day petitioners purchased the computer equipment, petitioners entered into a lease agreement with DPF whereby petitioners agreed to lease the IBM 3033-N8 mainframe computer and peripheral equipment back to DPF. The lease between petitioners and DPF is a net lease with a 10-year fixed rental agreement. Under the lease, DPF agreed to make the following fixed monthly lease payments to petitioners:

| | Monthly lease payments | |
|---|---|---|
| Petitioner | Months 1—18 | Months 19—120 |
| Frank Levy | $125 | $8,565.86 |
| Samuel Levy | 125 | 8,565.86 |
| Lee & Leon Oil | 251 | 17,132.72 |
| Total per month | 501 | 34,264.44 |

In addition to the fixed lease payments for the 10-year period of the lease, DPF agreed to pay petitioners 25 percent of all rental income received from end-users in the 6th through the 10th years of the lease, net of all of DPF's expenses related to the sublease of the equipment.

At the time petitioners purchased the computer equipment and entered into the lease agreement with DPF, the computer equipment was on lease to the end-user, Bristol-Myers Co., for 48 months at $45,513.50 per month. Bristol-Myers also had lease renewal options under which the rent would be reduced to specified rental figures based on the number of months for which the lease was renewed, as follows:

| Extension period | Extension period rental |
|---|---|
| 12 months | $43,143 per month |
| 24 months | 40,872 per month |
| 36 months | 38,601 per month |

Based on the rent-participation agreement between DPF and petitioners, petitioners would have received 25 percent of one of the above figures during the 6th through the 10th years of the 10-year lease to DPF, if Bristol-Myers renewed its end-user lease.

Petitioners, also on December 23, 1980, entered into a remarketing agreement with DPF. Under the terms of the remarketing agreement, DPF was designated as petitioners'

exclusive agent for purposes of remarketing the computer equipment either for sale or lease after the termination of the 10-year lease between petitioners and DPF. The remarketing agreement did not pertain to or affect in any way the end-user leases. DPF's compensation for remarketing services was to be 20 percent of any proceeds received from a sale or re-lease of the equipment, less all reasonable expenses. Petitioners, however, under the remarketing agreement, have the unilateral right upon 6-months notice to terminate the remarketing agreement with DPF at any time during the 6th through the 10th years of the lease with DPF. Also, if DPF terminated the 10-year lease early, or if DPF was otherwise in default on the lease, under the default provisions of the lease agreement all rights of DPF under the lease (including its rights under the remarketing agreement) would terminate.[5] Furthermore, under the lease agreement between petitioners and DPF, petitioners had no right to terminate the lease with DPF during the first 5 years of the lease. The cumulative effect of these provisions is that DPF's rights under the remarketing agreement were not significant during the first 5 years of the lease[6] and were subject to unilateral termination by petitioners during the second 5 years of the lease.

In preparing his cost-benefit analysis of the proposed investment, Mr. Kushner considered the rent-participation agreement in determining petitioners' potential to earn a profit on the transaction. Mr. Kushner projected a rental payment from DPF (based on projected end-user rental receipts of DPF) under the rent-participation agreement in the amount of $25,600 per month during the 6th through the 10th years of the lease to DPF.

Based on his calculations, Mr. Kushner projected that during the first 5 years of the transaction, petitioners would have a positive before-tax cash-flow relating to the transaction of $6,012.[7] This positive cash-flow was attributable to

---

[5]Sec. 14.2 of the lease agreement provides, in relevant part, that upon default by DPF, petitioners may at their option—

(iii) sell, dispose of, hold, use or lease any or all of the Equipment as [petitioners] in [their] sole discretion shall decide, without any duty to account to [DPF];

[6]Petitioners were contractually locked into the lease with DPF for the first 5 years, and if a default by DPF forced petitioners into remarketing the equipment, DPF would have lost its rights under the remarketing agreement.

[7]Monthly positive cash-flow of $501 times 12 equals $6,012 per year.

the difference between DPF's fixed lease payments to petitioners[8] and petitioners' fixed loan payments to AARK. [9] During years 6 through 10 of the transaction, in addition to the $6,012 in net fixed rent payments, it was projected that petitioners would receive $6,400 per month (25 percent of $25,600) in rent participation or $76,800 additional per year ($6,400 times 12). Therefore, during years 6 through 10 of the transaction, Mr. Kushner projected that petitioners would receive an annual positive before-tax cash-flow in the amount of $82,812 ($6,012 plus $76,800).

At the time of trial in this case, the equipment at issue was subleased to Data Sales Co. in Burnesville, Minnesota. That company had subleased the equipment to the end-user, United Pacific Insurance Co. in Federal Way, Washington. The equipment was subleased to Data Sales Co. beginning on January 14, 1985, for a 36-month period for $803 a month. In addition to the $34,264.44 in fixed lease payments from DPF, petitioners have received rent-participation payments attributable to the end-user lease with Data Sales in the amount of $200.75 per month ($803 times 25 percent equals $200.75).

*Expert Opinions*

Three different appraisers were retained to appraise the residual value of the computer equipment in issue and to opine on the financial viability of the transaction before us. One appraiser was retained by AARK to prepare an appraisal in December of 1980. The appraiser retained by AARK has been employed in the data processing industry since 1972. From 1975 through 1976, AARK's appraiser was a marketing representative with a large corporation and was responsible for managing the sale of part of an IBM lease portfolio with an original cost of over $600 million. From 1976 to the time of trial, AARK's appraiser operated and was president of his own company which acts as a broker and dealer in the purchase, sale, and leasing of IBM computer equipment. In addition, the company owned by

---

[8]$501 per month during the first 18 months and $34,264.44 per month during the 19th month through the end of the 5th year.

[9]Zero during the first 18 months and $33,764.44 per month during the 19th month through the end of the 5th year.

AARK's appraiser provides appraisal services with respect to IBM computers.

Respondent also obtained an appraiser to prepare an appraisal of the computer equipment involved in this case. The report by respondent's appraiser is dated May 15, 1986. Respondent's appraiser has been employed in the data processing industry since 1956. She was employed by IBM as a system services representative and by Burroughs Corp. as a sales technical representative. From 1966 to October of 1983, respondent's appraiser was employed at the General Services Administration where she provided information to the Defense Contract Audit Agency about residual values and economic lives for computers on lease in defense contractor plants. She has not had experience arranging financing for the purchase of data processing equipment.

Petitioners also retained an appraiser to prepare an appraisal. His report is dated October 10, 1986. Petitioners' appraiser has been employed for 20 years in the design, implementation, sale, and leasing of data processing equipment and computers. Petitioner's appraiser previously was employed by IBM's data processing division as a marketing representative. Petitioners' appraiser was the vice president and director of marketing for a publicly held computer leasing and real estate corporation, and he has served as an officer and director of a corporation where his responsibilities included marketing, computer leasing, and equipment sales. At the time of trial, petitioners' appraiser was the president and principal stockholder of a corporation engaged in the buying, selling, and leasing of computer equipment. The corporation also provides consulting and appraisal services with respect to life expectancies and residual values of computer equipment, and provides financial planning with respect to computer equipment acquisitions.

Among other things, each expert appraised, as of December 1980, the projected fair market values in December of 1980, May of 1984, and November of 1990 of the 3033-N8 central processor, the 3036-1 console, and the 3037-1 power and coolant unit which are involved in this case. The appraisal opinions are summarized below:

| Appraiser | IBM list price May 1980 | Fair market value | | |
|---|---|---|---|---|
| | | Dec. 1980 | May 1984 | Nov. 1990 |
| AARK's | $2,005,000 | $2,005,000 | $913,955 | $401,000 |
| Respondent's | [1]1,895,000 | 1,629,700 | [2] | 0 |
| Petitioners' | 2,005,000 | [3]2,084,500 to 2,274,000 | [4]30 to 50% of 1,895,000 | 5 to 20% of 1,895,000 |

[1]IBM list price as of Dec. 23, 1980.

[2]Respondent's appraiser did not include in her appraisal a projected fair market value for the equipment at the expiration of the initial end-user's lease but testified that the residual value of the equipment was zero in 1984.

[3]$1,895,000 list price plus a 5- to 10-percent delivery premium, reflecting the fact that the equipment already had been received from IBM, and another 5- to 10-percent premium for lease-related services.

[4]Petitioners' appraiser's fair market value projection was for May 1985.

## OPINION

### Sham Transaction

The first issue for decision is whether petitioners' investment in the IBM model 3033-N8 computer and peripheral equipment was a sham transaction devoid of economic substance.

In general, business transactions are given effect consistent with the substance and form of the transactions. When analyzing the substance and form of business transactions, this Court cannot ignore the reality that the tax laws affect the shape of most such transactions. *Frank Lyon Co. v. United States,* 435 U.S. 561, 576-580 (1978). Therefore, business transactions are not necessarily deprived of economic substance because of the existence of significant tax benefits that accrue to investors. *Frank Lyon Co. v. United States, supra* at 580-581; *Estate of Thomas v. Commissioner,* 84 T.C. 412, 432 (1985).

In sale-leaseback transactions, the form of the transactions will be respected for Federal tax purposes as long as the lessors retain significant and genuine attributes of traditional lessors. *Frank Lyon Co. v. United States, supra* at 584; *Estate of Thomas v. Commissioner, supra* at 432. For Federal income tax purposes, however, we must disregard sale-leaseback transactions as economic shams where we find that investors entered into such transactions with the sole business purpose of obtaining tax benefits and

where the transactions are devoid of economic substance because no reasonable opportunity for economic profit existed, exclusive of tax benefits. *Torres v. Commissioner,* 88 T.C. 702, 718 (1987); *Rice's Toyota World, Inc. v. Commissioner,* 81 T.C. 184, 209-210 (1983), affd. in part 752 F.2d 89, 91 (4th Cir. 1985); *Estate of Thomas v. Commissioner, supra* at 438-439.

Examinations into the business purpose and economic substance of transactions are inherently factual. *Larsen v. Commissioner,* 89 T.C. 1229, 1252 (1987); *Mukerji v. Commissioner,* 87 T.C. 926, 960 (1986); *Rice's Toyota World, Inc. v. Commissioner, supra* at 203. The business-purpose inquiry tends to be an inquiry of the investors' subjective purpose for entering into the transactions at issue. *Rice's Toyota World, Inc. v. Commissioner,* 752 F.2d 89, 92 (4th Cir. 1985), affg. in part 81 T.C. 184 (1983); *Packard v. Commissioner,* 85 T.C. 397, 417 (1985). In the sale and leaseback context, the owner-investors who accrue tax benefits must show that they entered into the transactions motivated by a business purpose sufficient to justify the form of the transactions. *Larsen v. Commissioner, supra* at 1252; *Rice's Toyota World, Inc. v. Commissioner,* 81 T.C. at 201.

The economic substance inquiry tends to be an analysis of the objective factors indicating whether the transactions had a reasonable opportunity of producing a profit, exclusive of tax benefits. *Rice's Toyota World, Inc. v. Commissioner,* 752 F.2d at 94; *Packard v. Commissioner, supra* at 417.

Petitioners, in this case, argue that their purchase and leaseback of computer equipment was motivated by a business purpose and was supported by economic substance. In support of their argument, they rely primarily on the fair market value purchase price of the equipment, the projected income and residual values with respect to the equipment, their initial cash investment, and the recourse nature of the debt obligations they incurred. Petitioners contend that the benefits and burdens of ownership of the equipment passed to them and that the debt obligations associated with the transaction are genuine. Petitioners contend that the transaction should be recognized for

Federal income tax purposes, and that they are entitled to all of the tax benefits afforded the owner of equipment.

Respondent argues that the equipment leasing transaction before us lacked a business purpose, that petitioners entered into the transaction only to accrue tax benefits, that the transaction lacked economic substance, and that the transaction should be disregarded as a sham for Federal income tax purposes. In support of his position, respondent contends that the transaction offered no potential for earning an economic profit or acquiring equity in the equipment and that no reasonable opportunity for profit existed based on the equipment's projected rental and residual value. Respondent also contends that petitioners did not acquire a depreciable interest in the equipment because the benefits and burdens of ownership of the equipment did not pass to petitioners and because petitioners' debt obligations were not genuine.

## Business Purpose

Based on our careful examination of the relevant facts and evidence in this case, we conclude that petitioners entered into the transaction in issue for sound business reasons (namely, to diversify their business investments by entering into a legitimate long-term investment involving the purchase and leaseback of computer equipment). Petitioners approached the decision to enter into this transaction in a businesslike manner. Petitioners' financial adviser thoroughly and in good faith investigated the proposed purchase-leaseback transaction. He prepared cash-flow analyses which included the components of the transaction that were critical to earning a profit on the investment. Those components included the current fair market value and projected residual value of the equipment, the fair rental value of the lease, and the rent-participation agreement. He explained to petitioners the significance of and risks associated with the projected residual value of the equipment and the rent-participation agreement. In addition, he explained to petitioners the tax consequences of the transaction. Petitioners also retained a law firm with expertise in leasing transactions to investigate the financial status and creditworthiness of each participant involved in the transaction,

to investigate each participant's business reputation, and to handle the legal aspects of this complex transaction.

We are satisfied that petitioners had a good-faith and substantial business purpose for entering into the transaction. Petitioners participated in the purchase-leaseback transaction only after they were convinced that the investment had the reasonable possibility of producing a profit.

## Economic Substance

In determining whether a transaction has economic substance apart from tax benefits, the following factors are particularly significant: The presence or absence of arm's-length price negotiations, *Helba v. Commissioner*, 87 T.C. 983, 1005-1007 (1986), affd. 860 F.2d 1075 (3d Cir. 1988); see also *Karme v. Commissioner*, 73 T.C. 1163, 1186 (1980), affd. 673 F.2d 1062 (9th Cir. 1982); the relationship between the sales price and fair market value, *Zirker v. Commissioner*, 87 T.C. 970, 976 (1986); *Helba v. Commissioner*, *supra* at 1005-1007, 1009-1011; the structure of the financing, *Helba v. Commissioner*, *supra* at 1007-1011; the degree of adherence to contractual terms, *Helba v. Commissioner*, *supra* at 1011; and the reasonableness of the income and residual value projections, *Rice's Toyota World, Inc. v. Commissioner*, 81 T.C. at 204-207.

In May of 1980, IBM's list price of the equipment at issue was $2,005,000. In November of 1980, IBM lowered the list price of the equipment to $1,895,000, but at that time, a purchaser of a new IBM 3033-N8 mainframe computer had to wait a number of months for delivery. We agree with petitioners that the value of the equipment increased because petitioners could deliver the equipment to an end-user immediately. *Torres v. Commissioner*, *supra* at 724; *Mukerji v. Commissioner*, *supra* at 965. At the time of petitioners' purchase, this essentially new equipment was already delivered and on lease for a minimum 48-month period to Bristol-Myers, the end-user. We accept petitioners' argument that this existing end-user lease increased the value of petitioners' equipment by at least an additional 5 percent over the then IBM list price plus the premium for delivery. Petitioners' total purchase price for the equipment was $1,980,297. The purchase price petitioners paid for the

equipment was reasonable and was not inflated. The price was duly negotiated and was the result of an arm's-length transaction between unrelated parties. *Gefen v. Commissioner*, 87 T.C. 1471, 1493 n. 12 (1986); *Abramson v. Commissioner*, 86 T.C. 360, 372 (1986).

As of December 1980, the financial risks petitioners assumed in connection with the projected rental income from the end-user lease were reasonable. The equipment already was on lease in the first year of a 4-year lease to an independent and creditworthy company. Early termination of the lease would subject the end-user to a substantial penalty. Lease renewal options in favor of the end-user for an additional 3 years beyond the initial 4-year lease term were negotiated at specified and substantial rental figures which were set forth in the end-user lease agreement. Noteworthy with regard to the projected rental income is the fact that DPF, an independent and unrelated company, in purchasing the equipment a few months earlier in 1980 and in leasing the equipment to an end-user under the 4-year lease mentioned above, had assumed essentially the same financial risks associated with the projected rental income stream from the equipment as did petitioners in December 1980.

At each stage of the transaction, the purchase of the equipment was financed by a cash downpayment and by recourse debt obligations. The cash downpayment and face amount of the promissory notes totaled the purchase price of the equipment and that price was based on the fair market value of the equipment. The interest rates ranging from 13 to 15 percent were commercially reasonable. Each participant was projected to earn a profit on the equipment based on the financial structure of the transaction. In addition, the 10-year fixed lease between DPF and petitioners was a net lease, under which the monthly lease payments from DPF to petitioners were $501 more than petitioners' monthly installment note payments to AARK. The participants involved in the transaction were not related entities, and at the time of trial, each participant in the transaction, including petitioners, had made all payments required under the various promissory notes and lease agreements.

We conclude that the substance of the transaction under consideration in this case conforms to the form utilized by the participants and that the structure of the transaction was commercially reasonable. The parties intended to enforce the promissory notes and lease agreements according to their terms, and the structure of the transaction was intended to conform to economic realities.

With respect specifically to residual value, the record establishes that petitioners' experts employed more credible forecasting techniques than those used by respondent's expert. In determining the residual value of the equipment, it is important to note that a business cannot operate on the basis of hindsight. *Mukerji v. Commissioner*, 87 T.C. 926, 965 (1986); *Estate of Thomas v. Commissioner*, 84 T.C. 412, 428-430 (1985). Our analysis with respect to the residual value of the equipment is based on the status of the economy and market conditions of the computer industry at the time the transaction was consummated.

Respondent's expert witness based her appraisal of a zero residual value for the equipment on the competition between IBM and several "plug compatible" companies. Respondent's expert witness, however, admitted at trial that she had no specific knowledge as to the "plug compatible" manufacturers' share of the market for mainframe computers. In addition, respondent's expert witness stated at trial that the market share for plug compatible manufacturers had leveled off by 1979, which is prior to the date of petitioners' transaction. Furthermore, the opinion of respondent's expert witness on residual value and fair market value was based in part on a January 1981 computer guide publication which was not available on the date petitioners purchased the equipment.

As explained, the appraiser retained by AARK made the independent appraisal that was part of the investment information received by petitioners in December of 1980. The forecast of the equipment's residual value by AARK's appraiser is similar to the appraisal done in 1986 by petitioners' expert witness. As of December 1980, the appraiser retained by AARK believed that petitioners' computer equipment had a projected residual value of $913,955 in May 1984, at the termination of the Bristol-Myers lease,

and $401,000 in November 1990, with a useful life comparable to that which had been experienced by the 360 and 370 series of IBM mainframe computers (namely, 10 to 15 years). As of December 1980, petitioners' expert witness believed that the projected residual value of petitioners' equipment in 1985 would range from 30 percent to 50 percent of $1,895,000, and in 1990 would range from 5 percent to 20 percent of $1,895,000, with the same useful life predicted by the appraiser retained by AARK. Based on the record, we believe that the analyses of petitioners' experts are more reliable than the analysis offered by respondent's expert.

We conclude that in 1980 it was reasonable for petitioners to believe that the equipment they purchased would have a residual value in 1990 in the range of 10 to 20 percent of petitioners' cost for the equipment thereof and that they would receive considerable additional revenue from the lease participation agreement, under which they were entitled to receive 25 percent of lease receipts upon termination or renewal in 1984 of the initial end-user lease.

We have determined that the purchase price paid by petitioners resulted from arm's-length price negotiations, that the financial structure of the transaction was commercially reasonable, that the participants adhered to the contractual terms, and that the projected income and residual values were not unrealistic. Thus, we conclude that there was a reasonable opportunity for petitioners to earn a pre-tax profit in excess of their actual investment in the computer equipment, and therefore that petitioners' investment in this transaction was supported by economic substance.

We hold that petitioners' transaction was a genuine multiple-party equipment-leasing transaction motivated by a business purpose and supported by economic substance.

*Benefits and Burdens of Ownership*

Respondent argues that even if the transaction had a business purpose and was not devoid of economic substance, a sale of the equipment to petitioners did not occur. The key to deciding whether a transaction constituted a sale for Federal income tax purposes is to determine whether the benefits and burdens of ownership passed to

the purported investors. *Larsen v. Commissioner,* 89 T.C. at 1267; *Grodt & McKay Realty, Inc. v. Commissioner,* 77 T.C. 1221, 1237 (1981). Whether the benefits and burdens of ownership passed is a question of fact which must be ascertained from the intentions of the parties as evidenced by the written agreements read in light of all of the relevant facts and circumstances. *Hulter v. Commissioner,* 91 T.C. 371, 388 (1988); *Reinberg v. Commissioner,* 90 T.C. 116, 132 (1988); *Grodt & McKay Realty, Inc. v. Commissioner, supra* at 1237; *Haggard v. Commissioner,* 24 T.C. 1124, 1129 (1955), affd. 241 F.2d 288 (9th Cir. 1956).

In previous cases involving the purchase and leaseback of computer equipment, this Court has found that in determining whether investors possess sufficient benefits and burdens of ownership to be regarded as owners of equipment, certain factors generally are considered to be neutral. Those neutral factors are: (1) The use of a net lease; (2) the absence of significant positive net cash-flow during the lease term; and (3) the fact that the rental income stream during the initial lease term is tailored to or matches interest and debt payments that are due. *Larsen v. Commissioner, supra* at 1267; *Estate of Thomas v. Commissioner, supra* at 433-438.

Factors generally relevant to that determination are: (1) The investors' equity interest in the computer equipment as a percentage of the purchase price; (2) a useful life of the property that extends beyond the lease term; (3) lease renewal or purchase options at the end of the lease term based on fair market value of the equipment at that time; (4) whether the projected residual value of the equipment plus the cash-flow generated by the rental of the equipment allows the investors to recoup at least their initial cash investment; (5) whether at some point a "turnaround" is reached whereby depreciation and interest deductions are less than income received from the lease; (6) whether the net tax savings for the investors are less than their initial cash investment; and (7) the potential for realizing a profit or loss on the sale or re-lease of the equipment. *Larsen v. Commissioner, supra* at 1267-1268; *Torres v. Commissioner, supra* at 721; *Gefen v. Commissioner,* 87 T.C. 1471, 1490-1495 (1986); *Mukerji v. Commissioner,* 87 T.C. 926,

967-968 (1986); *Estate of Thomas v. Commissioner, supra* at 433-438.

Petitioners initially invested approximately $500,000 of their cash in the equipment. This represented about 25 percent of the equipment's total cost of $2,005,000. The 10-year lease term between petitioners and DPF approximated the useful life of the computer equipment but the lease could be terminated by petitioners at any time after the first 60 months. The rent between petitioners and DPF was at a fair rental value for a fixed 10-year term, and petitioners were to receive 25 percent of the net rent received by DPF from end-users after the initial end-user lease with Bristol-Myers was terminated. The net fixed rent and the rent projected under the rental participation agreement, plus the projected residual value of the equipment, would have allowed petitioners to recoup their initial investment and to earn a profit. Any sale or re-lease of the equipment by DPF on petitioners' behalf was to be at fair market value or at an amount acceptable to petitioners.

In addition, although the investment offered petitioners tax savings in the early years, the depreciation and interest deductions were projected to be less than the income from the computer lease in later years. Because petitioners' deductions would be less than their income in later years, their financial adviser advised them to establish a sinking fund in the early years to pay additional taxes after the "turnaround" point was reached. Petitioners' financial adviser explained to petitioners that the projected net tax savings over the 10 years to the individual petitioners would be about $20,000 for a 50-percent interest. That amount was considerably less than petitioners' capital investment in the transaction (namely, $250,626 for a 50-percent interest). In addition, the projected net tax savings for a corporation would be about $14,000 for a 50-percent interest—also considerably less than petitioner Lee & Leon Oil's capital investment of $250,625.

With respect to petitioners' equity interest in the equipment and petitioners' indebtedness in relation to that equipment, the price petitioners paid for the equipment was approximately equal to its fair market value on the date of purchase, and the indebtedness to which the equipment was

subject was less than the equipment's fair market value. Thus, petitioners had an equity interest in the equipment that they could not prudently abandon, and petitioners' indebtedness was genuine. *Estate of Franklin v. Commissioner,* 544 F.2d 1045,1048 (9th Cir. 1976), affg. 64 T.C. 752 (1975); *Narver v. Commissioner,* 75 T.C. 53, 98-100 (1986), affd. per curiam 670 F.2d 855 (9th Cir. 1982).

Based on the above facts, it is clear that petitioners acquired significant benefits and burdens of owning the computer equipment, particularly the potential to realize a profit or loss on the sale or re-lease of the computer equipment. See *Gefen v. Commissioner, supra* at 1492; *Estate of Thomas v. Commissioner, supra* at 434; *Grodt & McKay Realty, Inc. v. Commissioner, supra* at 1238. We are satisfied that petitioners are to be regarded as owners of the computer equipment for Federal income tax purposes during the years in issue.

## At-Risk Issue

Respondent argues that petitioners were not at risk within the meaning of section 465 with respect to their debt obligations relating to the computer equipment. Under section 465, where individual investors or closely held corporations engage in the leasing of depreciable property, any loss with respect to the leasing activity is allowed only to the extent the investors are financially at risk with respect to the obligations of the leasing activity at the close of the taxable year. Secs. 465(a)(1) and 465(c)(1)(C). [10]

Investors generally are considered to be financially at risk with respect to investments in leasing activities to the extent they contribute money to the activities. Sec. 465(b)(1)(A). Investors also are considered to be financially at risk with respect to debt obligations of leasing activities to the extent they are personally liable for repayment of the debt obligations or to the extent they have pledged property, other than the property to be used in the activities, as security for the borrowed amounts. Sec. 465(b)(2).[11]

---

[10]Sec. 465 was added to the Internal Revenue Code by the Tax Reform Act of 1976, Pub. L. 94-455, 90 Stat. 1520, and applies to tax years beginning after Dec. 31, 1975.

[11]Sec. 465(b)(2) provides as follows:

With respect to particular debt obligations, investors will be regarded as personally liable for such obligations within the meaning of section 465(b)(2)(A) if they are ultimately economically liable to repay the obligations in the event funds from the investment activities are not available to repay the obligations. The critical inquiry is who is the obligor of last resort, and "the scenario that controls is the worst case scenario, not the best case." The fact that other investors or entities remain in the "chain of liability" does not detract from the at-risk amount of investors who have the ultimate liability. In determining which investors are ultimately financially responsible for the obligations, the substance of the transactions controls. *Melvin v. Commissioner*, 88 T.C. 63, 75 (1987), on appeal (9th Cir., Aug. 7, 1987); *Pritchett v. Commissioner*, 827 F.2d 644, 647 (9th Cir. 1987), revg. and remanding 85 T.C. 580 (1985); *Follender v. Commissioner*, 89 T.C. 943, 949-950 (1987). See also *Raphan v. United States*, 759 F.2d 879, 885 (Fed. Cir. 1985).

The above limitation on debt obligations with respect to which investors will be considered at risk is reflected expressly in the statutory scheme. Section 465(b)(4)[12] provides that even though investors nominally may be personally liable with respect to debt obligations, for tax purposes they will not be considered at risk for those debt obligations if their ultimate liability with respect to the debt obligations is protected against loss through "nonrecourse financing, guarantees, stop loss agreements, or other similar arrangements." The language "other similar arrangements" is not specifically defined in the Code or in the legislative history, but the legislative history does evidence concern with situations in which investors are effectively immunized

---

(2) BORROWED AMOUNTS.—For purposes of this section, a taxpayer shall be considered at risk with respect to amounts borrowed for use in an activity to the extent that he—

(A) is personally liable for the repayment of such amounts, or

(B) has pledged property, other than property used in such activity, as security for such borrowed amount (to the extent of the net fair market value of the taxpayer's interest in such property).

No property shall be taken into account as security if such property is directly or indirectly financed by indebtedness which is secured by property described in paragraph (1).

[12]Sec. 465(b)(4) provides as follows:

(4) EXCEPTION.—Notwithstanding any other provision of this section, a taxpayer shall not be considered at risk with respect to amounts protected against loss through nonrecourse financing, guarantees, stop loss agreements, or other similar arrangements.

from any realistic possibility of suffering an economic loss even though the underlying transaction was not profitable. *Larsen v. Commissioner, supra* at 1272-1273; *Melvin v. Commissioner, supra* at 70-71; *Bennion v. Commissioner,* 88 T.C. 684, 692 (1987); *Porreca v. Commissioner,* 86 T.C. 821, 838 (1986); S. Rept. 94-939 (1976), 1976-3 C.B. (Vol. 3) 49, 87.

Section 465(b)(3) imposes yet further limitations on amounts with respect to which investors will be considered at risk. Under that provision, among other limitations, investors will not be considered at risk for debt obligations with respect to leasing activities if the particular creditors associated with the debt obligations have continuing interests in the leasing activities other than as creditors.[13]

Petitioners contend that they should be considered at risk for the full amount of their debt obligations to AARK arising out of their purchase from AARK of the IBM computer equipment at issue in this case. Petitioners claim they are personally and ultimately liable on the debts to AARK, that they were not in any way protected against loss with respect to the obligations, and that AARK had no continuing interest in the transaction other than as a creditor. Petitioners also contend that these at-risk issues were not raised in respondent's notice of deficiency and that the Court should refuse to consider them as untimely.

Respondent concedes that petitioners nominally were personally at risk with respect to the debt obligations owed to AARK. Respondent contends, however, that AARK was a mere straw participant in this transaction and therefore that DPF, not AARK, should be regarded as the creditor with respect to petitioners' debt obligations. Respondent then argues that DPF, through the remarketing agreement, had a prohibited continuing interest in the transaction other than as a creditor. Respondent also contends that petitioners were protected against loss through certain discharge and setoff features of their promissory notes to AARK.

---

[13]Sec. 465(b)(3) provides, in relevant part, as follows:

(3) CERTAIN BORROWED AMOUNTS EXCLUDED.—For purposes of paragraph (1)(B), amounts borrowed shall not be considered to be at risk with respect to an activity if such amounts are borrowed from any person who—

(A) has an interest (other than an interest as a creditor) in such activity, or * * *

In *Seligman v. Commissioner,* 84 T.C. 191, 198 (1985), affd. 796 F.2d 116 (5th Cir. 1986), we commented that the inherent power of this Court to consider new issues or new arguments in support of an adjustment does not give respondent carte blanche authority to assert additional bases for his adjustments at any time prior to the issuance of an opinion. See Rule 41, Tax Court Rules of Practice and Procedure. Where surprise and prejudice, however, are not shown to result from a consideration of a new issue or theory, the Court may conclude that it is appropriate to consider the new issue or theory. *Seligman v. Commissioner, supra* at 198 n. 7; *Johnsen v. Commissioner,* 83 T.C. 103, 120-121 (1984), revd. on other grounds and remanded 794 F.2d 1157 (6th Cir. 1986); *Grow v. Commissioner,* 80 T.C. 314, 329 (1983); *Nat Harrison Associates, Inc. v. Commissioner,* 42 T.C. 601, 617 (1964).

After considering the above authority and on the facts and circumstances of this case, at trial we allowed respondent to amend his answer to raise the at-risk argument under section 465(b)(3) (namely, whether the relevant creditor had a continuing interest in the instant leasing transaction other than as a mere creditor). In post trial briefs, respondent also raised the at-risk argument that arises under section 465(b)(4) (namely, whether petitioners were protected against loss on their recourse debt obligations). In our opinion and on the facts of this case, petitioners are not prejudiced by our allowing respondent to rely on section 465(b)(4) in making his at-risk arguments. For the reasons stated, respondent's arguments under sections 465(b)(3) and 465(b)(4) will be addressed, *infra.*

*Sec. 465(b)(3)—*
*Interests Other Than an Interest as a Creditor*

Implicitly acknowledging that AARK had no continuing interest in the transaction other than as a creditor on petitioners' purchase money indebtedness, respondent argues that AARK was a straw entity that must be disregarded and that DPF was the real creditor whose continuing role in the transaction must be considered for purposes of the limitation of section 465(b)(3). Respondent then argues that DPF's right to remarket the equipment and to share in

the net profits of any sale or re-lease of the equipment constituted a prohibited other interest in violation of section 465(b)(3).

In *Bennion v. Commissioner, supra* at 699, we explained that—

where a taxpayer is primarily and ultimately liable within the meaning of section 465(b)(2)(A) to a number of creditors in a chain of liability * * * , the "interest other than an interest as a creditor" prohibition of section 465(b)(3)(A) must be analyzed at each link of the chain. * * *

Under the above rationale, the "other interests" of each creditor in this transaction (namely, AARK, DPF, and MHLC) must be analyzed. Merely because some of the creditors in the chain of liability may not have a prohibited other interest does not end the analysis. Other intermediate or ultimate creditors in the chain of liability may have prohibited other interests that may so affect the interests of the parties to the transaction that the debt obligations owed by the investor-taxpayers may not be regarded as debt obligations owed to truly independent creditors. We previously explained this policy, as follows:

Creditors who hold recourse obligations, but who also have certain other interests in the activity, might disregard their rights thereunder in favor of protecting or enhancing their other interests in the activity. In light of that eventuality and in spite of the otherwise recourse nature of the debt, taxpayers who owe recourse debt obligations to such creditors are not to be regarded as at risk with respect thereto. [*Bennion v. Commissioner, supra* at 698.]

As stated, respondent acknowledges that AARK had no continuing interest in the transaction other than as a creditor, and respondent makes no argument that MHLC ever had any interest in the transaction other than its creditor interest. Respondent, however, argues that DPF's continuing interest as the potential remarketing agent of the equipment constitutes a prohibited other interest. If it does, we then would have to decide how such prohibited other interest, for purposes of section 465(b)(3), affects the debt obligations of petitioners in light of the presence of two creditors on either side of DPF (namely, MHLC and AARK) who have no prohibited other interests. For an

example of that analysis see *Bennion v. Commissioner, supra* at 695-700, in which the presence of two intermediate creditors with prohibited other interests was found not to taint the independent creditor status of the outside bank vis-à-vis the debt obligations of the investor-taxpayers, and thus the prohibited other-interest rule of section 465(b)(3) was found not to have been violated.

As explained, we first analyze whether DPF has a continuing financial interest in this transaction other than as a creditor in violation of section 465(b)(3). In 1979, the Treasury issued proposed regulations under section 465(b)(3) which provide that creditors will be deemed to have prohibited interests if they have either a "capital interest" in the activity, or an interest in the "net profits" of the activity. Sec. 1.465-8(b), Proposed Income Tax Regs., 44 Fed. Reg. 32239 (June 5, 1979).[14] We have utilized these two tests as a guideline in determining whether any of the creditors in a transaction have prohibited other interests. *Larsen v. Commissioner, supra* at 1270; *Bennion v. Commissioner, supra* at 696; *Jackson v. Commissioner,* 86 T.C. 492, 529 (1986), on appeal (10th Cir., Feb. 3, 1987).

A capital interest is described in the proposed regulations as an interest in the assets of an activity which would make the assets, or a portion thereof, distributable to the owner of the interest upon liquidation of the activity. Sec. 1.465-8(b)(2), Proposed Income Tax Regs., *supra.* Because DPF had no continuing capital interest in the equipment

---

[14]Sec. 1.465-8(b), Proposed Income Tax Regs., 44 Fed. Reg. 32239 (June 5, 1979), provides, in relevant part:

(b) *Loans for which the borrower is personally liable for repayment.—(1) General rule.* If a borrower is personally liable for the repayment of a loan for use in an activity, the lender shall be considered a person with an interest in the activity other than that of a creditor only if the lender has either a capital interest in the activity or an interest in the net profits of the activity.

(2) *Capital interest.* For the purposes of this section a capital interest in an activity means an interest in the assets of the activity which is distributable to the owner of the capital interest upon the liquidation of the activity. The partners of a partnership and the shareholders of a corporation described in section 1371(b) are considered to have capital interests in the activities conducted by the partnership or corporation,

(3) *Interest in net profits.* For the purposes of this section it is not necessary for a person to have any incidents of ownership in the activity in order to have an interest in the net profits of the activity. For example, an employee or independent contractor any part of whose compensation is determined with reference to the net profits of the activity will be considered to have an interest in the net profits of the activity.

that was distributable to it upon liquidation of the activity,[15] that provision is not applicable.

With regard to the net profits test, an interest in the net profits of an activity may exist, under the proposed regulations, even though the lender does not possess any incidents of ownership in the activity. We have held that rights under a remarketing agreement may constitute an interest in the net profits of an activity and may violate section 465(b)(3). *Bennion v. Commissioner, supra* at 698. Under the terms, however, of the lease and remarketing agreements between petitioners and DPF that are involved in this case, no remarketing of the equipment was contemplated until the end of the 10-year lease term. Also, during the first 5 years of the lease, upon a termination of the lease by DPF or upon any default by DPF (either of which events would require an early remarketing of the equipment), DPF's rights under the remarketing agreement would be terminated. During the second 5 years of the lease and at the end of the 10-year lease term, petitioners have the right to unilaterally terminate the remarketing agreement without cause. In light of these provisions, DPF's rights under the remarketing agreement are too indefinite and tenuous to constitute a prohibited other interest under section 465(b)(3).

Section 465(b)(3) contemplates fixed and definite rights or interests that realistically may cause creditors to act contrary to how independent creditors would act with respect to their rights under the debt obligations in question. The indefinite and terminable right DPF has under the particular remarketing agreement before us does not constitute such a right or interest.

For the reasons stated, we conclude that DPF's interest in the remarketing agreement does not constitute a continuing interest in this transaction other than as a creditor. Having so found and in light of respondent's implicit concession that no other creditor involved in this transaction (namely, AARK and MHLC) had continuing interests other than as creditors, the provisions of section 465(b)(3) have not been violated by this transaction.

---

[15]Indeed DPF's purpose for participating in the transaction in the first place was to dispose of its capital interest in the equipment.

## *Sec. 465(b)(4)—Protection Against Loss*

Respondent's next at-risk argument is that certain discharge provisions contained in the promissory note between petitioners and AARK constitute a guarantee, a stop loss agreement, or other similar arrangement under section 465(b)(4). Labels do not control this analysis. The issue must be resolved on the basis of who realistically will be the payor of last resort if the transaction goes sour and the secured property associated with the transaction is not adequate to pay off the debt.

As stated in *Melvin v. Commissioner*, 88 T.C. 63, 75-76 (1987), on appeal (9th Cir., Aug. 7, 1987), particularly relevant to our analysis of this issue is the direction given to the Treasury by Congress in the Deficit Reduction Act of 1984, in response to the decision of the Claims Court in *Raphan v. United States*, 3 Cl. Ct. 457 (1983). In that case, the Claims Court made a determination of liability, or lack of liability, based primarily on the form of the transaction and on certain labels used by the parties to the transaction.[16] In response to the Claims Court decision in *Raphan,* Congress specifically directed the Treasury to promulgate regulations under section 752 to consider the substance, and not merely the form, of financing, and particularly to consider current commercial lending practices with respect to guarantees, assumptions, and indemnities. Sec. 79, Deficit Reduction Act of 1984, Pub. L. 98-369, 98 Stat. 494, 597; H. Rept. 98-861, at 869 (Conf. 1984), 1984-3 C.B. (Vol. 2) 123. We also believe it appropriate and incumbent on us to take into account, in the context of the instant section 465(b)(4) issue, the substance and the commercial realities of the financing arrangements presented to us.

With this in mind, our analysis of the loan provisions in question and of the other relevant aspects of this transac-

---

[16]In *Raphan v. United States*, 3 Cl. Ct. 457 (1983), the Claims Court held that because none of the partners was personally liable on a partnership debt obligation, each limited partner was allowed to increase his basis in his investment in the partnership by his pro rata share of the partnership debt. The Claims Court treated the liability of the general partner under his "guarantee" of the partnership debt as a secondary liability since the word "guarantee" generally connotes a secondary liability vis-à-vis the primary obligor. *Raphan v. United States, supra* at 465-466. The Court of Appeals for the Federal Circuit reversed the Claims Court and held that in spite of the use by the parties of the term "guarantor," the general partner was personally liable for the partnership debt because he ultimately was liable therefor. *Raphan v. United States*, 759 F.2d 879, 886 (Fed. Cir. 1986).

tion leads us to conclude that petitioners are not protected against loss with respect to their debt obligations. Considering the rights and responsibilities of each participant in this transaction under the loan provisions relied on by the parties, the ultimate creditor is MHLC and the ultimate debtors are petitioners. Under the discharge provisions of petitioners' installment notes to AARK, if AARK and DPF fail to utilize the proceeds of petitioners' debt payments to make their respective debt payments that are due to DPF and MHLC, petitioners will not be obligated to make duplicate payments of those same amounts to DPF or to MHLC. Their debt obligations with respect to DPF or to MHLC will be discharged because petitioners already will have paid them once (namely, to AARK). Also, if AARK becomes delinquent in its payments to DPF, petitioners (under the recognition agreement between petitioners and DPF) have the option to make their debt payments directly to DPF.

The sum and substance of the various discharge provisions at each level of the transaction before us (at least of those provisions relied on by the parties in this case) support our conclusion that MHLC is the ultimate creditor and that petitioners are the ultimate debtors with respect to the purchase of the IBM computer equipment involved in this case. Petitioners are not protected against being personally liable with respect to the unpaid balance of their recourse debt obligations.[17]

For the above reasons, we conclude that petitioners are at risk under section 465 with respect to their debt obligations

---

[17]The various transaction documents in the record in this case contain language similar to language contained in the documents involved in *Klagsburn v. Commissioner*, T.C. Memo. 1988-364. The security agreement between petitioners and AARK gives AARK a "right to receive" rent payments DPF owes petitioners if petitioners fail to make timely debt payments to AARK. *Klagsburn* also involved a multiple-party sale-leaseback of computer equipment that DPF sold to investors through AARK. The security agreement between AARK and the investors in that case also provided that AARK had the "right to receive" DPF's monthly lease payments owed to investors if the investors became delinquent in their debt payments to AARK. Both parties in *Klagsburn* conceded that this language (coupled with language in the installment promissory note between AARK and DPF that gave AARK the right to set off against its debt payments to DPF any "liabilities" DPF owed to AARK) constituted a protection against loss under sec. 465(b)(4). Based upon that concession, the Court went on to consider other aspects of the at-risk rules of sec. 465(b)(4) (namely, the effect of the potential bankruptcy of DPF on the stipulated "protection-against-loss" feature of the transaction). The Court gave no consideration to the merits of the threshold question conceded by the parties. The effect of that language on the sec. 465(b)(4) issue has not been raised in this case, and we decline to address it.

to AARK arising out of the purchase of the IBM computer equipment.

*Activity for Profit*

Respondent disallowed deductions claimed by petitioners for depreciation and other miscellaneous expenses relating to petitioners' ownership of the IBM computer equipment. Respondent's disallowance was based on his determination that petitioners' investment, under section 183, was not entered into or engaged in as an activity for profit.

In order to find that an activity was engaged in for profit under section 183, it must be established that the investors had an "actual and honest objective of making a profit." *Hulter v. Commissioner*, 91 T.C. 371, 392, 393 (1988); *Ronnen v. Commissioner*, 90 T.C. 74, 91 (1988); *West v. Commissioner*, 88 T.C. 152, 159 (1987); *Landry v. Commissioner*, 86 T.C. 1284, 1303 (1986); *Dreicer v. Commissioner*, 78 T.C. 642, 646 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983). See also *Capek v. Commissioner*, 86 T.C. 14, 36 (1986); *Fuchs v. Commissioner*, 83 T.C. 79, 97-98 (1984); *Dean v. Commissioner*, 83 T.C. 56, 73-77 (1984). Respondent also argues that to satisfy the profit-objective test of section 183, the investors must have entered into the activity primarily to earn a profit. We believe the profit-objective test of section 183 is satisfied once it is determined that the investors had an actual and honest profit objective for entering into the activity.

In the context of certain congressionally blessed tax-oriented transactions, it is particularly appropriate to focus on the actual and honest nature of the investors' objectives for entering into the transaction. In *Fox v. Commissioner*, 82 T.C. 1001, 1021 (1984), affd. 798 F.2d 65 (2d Cir. 1986), we explained that—

a multitude of transactions which are likely to be motivated primarily by tax reasons is nonetheless sanctioned under the tax laws. Examples of such transactions are the purchase of tax-exempt securities; purchases of property motivated by the availability of accelerated depreciation, the investment credit, and the deductibility of interest; safe-harbor leasing; renovation of historic structures; location of subsidiaries in Puerto Rico because of tax credits; acquiring interests in low income housing partnerships; and many others. Indeed, some of these transactions are arguably *solely* tax motivated. [*Fox v. Commissioner*, 82 T.C. at 1021.]

Equipment leasing transactions (that are economically viable and that are not sham transactions) would appear to qualify as a type of significantly tax-motivated transaction that Congress intended to encourage. The focus of the section 183 analysis should be on the economic viability of the transaction and on the actual and honest nature of the investors' profit objectives.

Based upon the above principles and having already determined that the transaction before us was economically viable and was not a sham, we must determine whether petitioners entered into the equipment leasing transaction with AARK and DPF with an actual and honest objective to earn a profit apart from anticipated tax benefits. This determination should be based upon an analysis of all of the facts and circumstances relevant to the transaction. The financial economics of the transaction and other objective factors are particularly relevant in this analysis. Petitioners' testimony and other subjective factors also are relevant. *Hulter v. Commissioner*, 91 T.C. 371, 393-394 (1988); *Dreicer v. Commissioner*, 78 T.C. 642, 645 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983).

In our analysis *supra*, of the economic substance of the transaction before us, we already have commented on many of the objective factors that indicate the presence of a good-faith profit objective on the part of petitioners in entering into this transaction. Certainly mistakes were made. Projections of rental income and residual value turned out to be overly optimistic. In spite of those mistakes, however, and in light of the many other factors we have discussed, we conclude that petitioners conducted themselves in a businesslike manner at all stages of this investment. They and their representatives carefully analyzed the transaction.

During the first 18 months after the transaction was closed, petitioners received net rental income of $501 a month. During the remaining 8½ years of the 10-year lease to DPF, petitioners' monthly payments on their debt obligations to AARK were $33,763.44, and they have received or are to receive monthly lease payments from DPF in the amount of $34,264.44. Petitioners, therefore, during the remaining 8½ years of the lease to DPF either have received

or will receive $501 a month in net proceeds ($34,264.44 minus $33,763.33), or $6,012 per year ($501 times 12). Thus, after petitioners' debt obligations were offset by the fixed lease payments, petitioners could expect to receive over the 10-year lease term a total of $60,120 (10 years times $6,012 a year) in net proceeds from the difference between the fixed lease payments and their fixed loan payments.

Under the rent-participation agreement, petitioners' financial adviser projected additional annual rental income in the amount of $76,800 per year for years 1986 through 1990. The appraisal of the computer equipment's residual value projected that the equipment would be worth $401,000 in 1990. Petitioners reasonably expected to receive the following total proceeds from their investment:

| Petitioner | From DPF lease after debt payments to AARK | 25% rent participation (5 years) | Residual value in 1990 | Total |
|---|---|---|---|---|
| Lee & Leon Oil | $30,120 | $192,000 | $200,500 | $422,620 |
| Frank Levy | 15,000 | 96,000 | 100,250 | 211,250 |
| Samuel Levy | 15,000 | 96,000 | 100,250 | 211,250 |
| Total | 60,120 | 384,000 | 401,000 | 845,120 |

Although not completely clear in the record, it appears petitioners' total equity investment in the equipment was:

| Lee & Leon Oil | Frank Levy | Samuel Levy |
|---|---|---|
| $250,625 | $125,313 | $125,313 |

Petitioners' projected return on their investment substantially exceeded their equity. In hindsight, the projections proved to be wrong, but as of December 1980, the residual value and rent-participation projections were reasonable, and they were relied on in good faith by petitioners. Petitioners continued leasing the equipment to an end-user through the date of trial, and petitioners continued to receive a nominal amount of annual net proceeds from the investment in spite of the low actual residual value of the computer equipment.

We conclude that petitioners engaged in the activities at issue with the actual and honest objective of earning a profit.

*Decisions will be entered under Rule 155.*