JAMES AND LOUISE A. MARTUCCIO, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Martuccio v. Commissioner
Docket No. 27528-88
United States Tax Court
T.C. Memo 1992-311; 1992 Tax Ct. Memo LEXIS 329; 63 T.C.M. (CCH) 3082; June 1, 1992, Filed *329 Decision will be entered under Rule 155. Robert D. Grossman and Susan M. Delbert, for petitioners. Karen E. Chandler, for respondent. WELLS
WELLS
MEMORANDUM FINDINGS OF FACT AND OPINION WELLS, Judge: Respondent determined deficiencies in and additions to petitioners' Federal income tax as follows: Additions to Tax
Year
Deficiency
Sec. 6653(a)(1)
Sec. 6653(a)(2)
Sec. 6661
1981
[1] $ 34,722.47
$ 2,042.01
[2]
--    1982
62,199.00
3,105.95
[3]
$ 15,529.75
1983
[4] 52,379.02
2,653.53
[5]
13,094.88
1984
46,276.00
2,313.80
[6]
11,569.00
*330 Respondent also determined for the taxable years in issue that petitioners are liable for increased interest under section 6621(c). Unless otherwise noted, all section references are to the Internal Revenue Code as in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. The issues to be decided in the instant case are as follows: (1) Whether petitioner James V. Martuccio was "at risk" with respect to debt incurred as part of a computer leasing transaction he entered into during 1981; (2) whether a separate computer leasing transaction entered into during 1984 by petitioner James V. Martuccio is to be recognized for Federal income tax purposes; (3) whether petitioners are entitled to deduct partnership losses of $ 14,301 claimed on their 1981 return in connection with National Drilling Program Ltd. #4; (4) whether petitioners failed to properly report taxable interest income of $ 592 on their 1981 return; (5) whether petitioners failed to properly report taxable dividends of $ 1,440 on their 1983 return; (6) whether petitioners are liable for the negligence addition under section 6653(a) for each of the years in issue; (7) *331 whether petitioners are liable for the substantial understatement addition under section 6661 for taxable years 1982, 1983, and 1984; and (8) whether petitioners are liable for increased interest on underpayments of tax attributable to tax-motivated transactions under section 6621(c) for each of the taxable years in issue. FINDINGS OF FACT At the time the petition in the instant case was filed, petitioners resided in Warren, Ohio. Petitioner [1] is a self-employed orthodontist. During the years in issue, petitioner's net worth rose from $ 1 million to $ 1,250,000. Petitioner Louise A. Martuccio was employed as a secretary and bookkeeper in petitioner's practice during the years in issue. The 1981 Transaction
During 1981, Elmco, Inc., (Elmco) was a corporation which raised equity for *332 leasing companies by arranging equipment leasing transactions with investors seeking "tax deferral benefits". During the years in issue, Elmco arranged equipment leasing transactions with leasing companies and, working through stockbrokers and registered securities dealers, Elmco circulated offering memoranda to investors explaining the terms of such transactions. If a client was interested, the broker contacted Elmco to put together an investment package. When advised of a prospective investor, Elmco identified particular equipment to include in the investor's transaction and negotiated with a leasing company to buy such equipment, which had an estimated market value equal to the amount the investor wanted to invest. To determine the value of such equipment, Elmco hired an appraiser. Elmco also used such appraiser to assist it in negotiating overall sale terms with leasing companies, and, consequently, often knew in advance what the appraiser's valuation of particular equipment was likely to be. Elmco also consulted the Computer Price Guide and other trade publications for assistance in valuing the equipment. In addition to assembling the equipment package, Elmco figured the *333 amount and terms of the investor's notes and the lease, including the amount of supplemental rents to be paid to the investor. One of the brokers contacted by Elmco was Butcher & Singer. During 1981, Butcher & Singer provided petitioner with a Preliminary Private Offering Memorandum concerning the computer leasing transaction in issue (the 1981 transaction). Petitioner consulted with his advisers at Butcher & Singer, his accountant, his wife, and his father as to whether the 1981 transaction presented a good investment opportunity. Petitioner's accountant reviewed the offering memorandum and considered the return it was expected to produce from tax savings and earnings from the lease of the equipment. After concluding that the 1981 transaction was sound, the accountant advised petitioner to invest in it. Petitioner also consulted with his attorney, who reviewed the documents connected with the 1981 transaction. Petitioner's attorney advised petitioner that he would be "at risk" on the promissory notes involved in the 1981 transaction. The attorney provided no advice concerning the financial merits of the 1981 transaction. Both petitioner's accountant and his attorney advised *334 him that he would be personally liable on the notes executed as part of the 1981 transaction. In deciding to invest, petitioner relied upon the advice he received from Butcher & Singer, his accountant, and the others with whom he consulted. Petitioner had no understanding of Elmco's financial status at the time of the 1981 transaction and had no contact with Tiger Computer (Tiger) prior to such time. The IBM computer equipment, which is the subject of the 1981 transaction, was originally owned by Tiger, which had rented it to Consolidated Edison Company of New York, Inc., (ConEd) under a net lease for a term of 48 months. Tiger was a division of National Equipment Rental, Ltd. (NER), a corporation engaged in the business of leasing computer equipment and providing related services. NER financed the acquisition of such equipment by borrowing funds from Manufacturers Hanover Leasing Corp. (MHLC) under a Loan and Security Agreement dated June 3, 1981. The debt was payable in 48 consecutive monthly installments, and was nonrecourse, except that MHLC was authorized to proceed directly against NER, without initially or exclusively proceeding against the collateral, in the event that
*335 any warranty, representation, covenant or agreement made by the Borrower [NER] to MHLC under this Agreement relating either to the Lease or any related document or this [Loan and Security] Agreement proves to be incorrect or untrue in any material respect at the time when made or is not performed as agreed to.
Pursuant to the Loan and Security Agreement, MHLC obtained a continuing first priority interest in the equipment and an assignment of the lease between Tiger and ConEd, and all rents and other amounts due thereunder. All such rents and other amounts due NER under such lease were to be paid directly to MHLC. By a Purchase Agreement dated December 21, 1981, Tiger sold a portion of the computer equipment (the equipment) acquired with the loan from MHLC to Elmco. Under the terms of the purchase agreement with Tiger, Elmco paid $ 472,000 for the equipment in the following manner: $ 8,375 in cash, three nonnegotiable, nonrecourse purchase money promissory notes totaling $ 64,125, and a nonnegotiable, nonrecourse promissory note of $ 400,000. The $ 400,000 note carried an interest rate of 17 percent per annum and was payable over a term of 108 months, commencing January *336 31, 1982, and ending December 31, 1990. Payments 1 through 36 were $ 5,666.67 each, and payments 37 through 108 were $ 8,898.45 each. An interim payment of $ 1,889 was due December 31, 1981. Tiger gave Elmco the following indemnity as part of the purchase agreement: Seller, [Tiger] will indemnify Purchaser [Elmco] and protect, defend and hold it harmless from and against any and all loss, cost, damage, injury or expenses, including, without limitation, reasonable attorneys' fees, wherever and however arising which Purchaser may incur by reason of any material breach by Seller of any of the representations, warranties and covenants or obligations set forth herein, or by reason of the bulk transfer laws of any jurisdiction.
Under the note, Tiger was prohibited, even in the event of default by Elmco, from accelerating or otherwise changing the timing or amount of the payments due under the note without the express written consent of Elmco. Furthermore, Tiger agreed to indemnify Elmco for any loss or expense which Elmco might incur because of material breach by Tiger of any of the warranties, covenants, or obligations set forth in the purchase agreement. By letters dated December *337 1, 1981, MHLC agreed that Elmco would have no personal liability for payment of the amount due MHLC under the Loan and Security Agreement between NER and MHLC or for satisfaction of NER's obligations thereunder. As part of the sale, Elmco executed a Collateral Assignment granting Tiger a security interest in the equipment against Elmco's default on its obligations to Tiger and Elmco's right to receive payments under the leaseback of the equipment to Tiger. On December 21, 1981, petitioner purchased the equipment from Elmco. The purchase agreement between petitioner and Elmco provided that their rights were subordinate to the rights of the holders of encumbrances, namely MHLC, and the rights of the lessees and sublessees, namely ConEd. Elmco also gave petitioner the following indemnity protection: Seller [Elmco] will indemnify Purchaser [petitioner] and protect, defend and hold it harmless from and against any and all loss, cost, damage, injury or expense, including, without limitation, reasonable attorneys' fees, wherever and however arising which Purchaser may incur by reason of any material breach by Seller of any of the representations, warranties and covenants or obligations *338 set forth herein, or by reason of the bulk transfer laws of any jurisdiction.
Petitioner paid an aggregate purchase price of $ 500,000 for the equipment, consisting of $ 18,000 in cash, three negotiable recourse purchase money notes totaling $ 82,000, and a nonnegotiable installment promissory note in the amount of $ 400,000, which provided that it was recourse to the extent of $ 312,104. The first purchase money note of $ 30,000 was due June 30, 1982; the second such note of $ 26,000 was due January 31, 1983; and the third such note of $ 26,000 was due January 31, 1984. Elmco assigned petitioner's three promissory notes to Tiger for security purposes. The installment promissory note bore an interest rate of 17 percent and was payable over 108 months, beginning January 31, 1982, and ending December 31, 1990. The first 36 monthly payments were $ 5,667.67 each, and the remaining 72 payments were $ 8,898.45 each. The installment note was not assigned to Tiger. Concurrent with the purchase of the equipment, petitioner executed a lease of the equipment to Tiger. The term of the lease began December 21, 1981, and ended December 31, 1990, a period of slightly more than 108 months. *339 The lease was a net lease and entitled Tiger to sublease the equipment. The lease required an interim fixed rental payment of $ 1,889 on December 31, 1981, and rental payments of $ 5,666.67 for the first 36 months of its term and $ 9,256.45 per month for the remaining 72 months. The lease also provided that Tiger would share with petitioner a specified percentage of net re-lease proceeds after December 31, 1985. Tiger gave petitioner the following indemnity protection in the lease: 8.4 Loss of Federal Income Tax Benefits - Lessee [Tiger] agrees that it will take no action or position for United States federal income tax purposes inconsistent with or adverse to the ownership of the Equipment by Lessor, [petitioner] it being agreed that (i) the claim by Lessee, after the date hereof, of any deduction for depreciation with respect to the Equipment shall be deemed inconsistent with or adverse to such ownership, and (ii) the attempted grant by Lessee of a purchase option or a security interest or any nonterminable possessory right in the Equipment shall be deemed inconsistent with or adverse to such ownership (it being further understood that any such option, security interest *340 or nonterminable possessory right need not be recognized by Owner); provided that nothing herein shall be deemed to prevent Lessee from assigning its rights to rentals under the End Lease or granting security interests in the Equipment pursuant to assignments and security interest made previous hereto and disclosed to Lessor. Lessee does hereby assume liability for and does hereby agree to indemnify Lessor against any and all liabilities, losses, penalties costs and expenses, including attorneys' fees and income taxes of Lessor arising from any payment by Lessee under this Section 8.4, imposed upon, asserted against or suffered by Lessor due to any action of Lessee which constitutes an Event of Default under Section 17.1 hereto and which causes the disallowance of Lessor's deduction for depreciation of the Equipment as otherwise provided by Section 167(a) of the Internal Revenue Code of 1954, as amended, or the loss of any other benefits for federal income tax purposes which accrue to Lessor on account of its ownership of the Equipment. Lessee represents to Lessor that for accounting purposes it will not treat this Lease as a capitalized Lease as that term is used in the Financial *341 Accounting Standards Board Statement of Financial Accounting Standards No. 13.
The events of default referred to in the foregoing provision included Tiger's failure to pay rent under the lease, breach of any provision of the lease, transfer or encumbrance of the equipment, or insolvency. In the lease, Tiger provided petitioner with the following further indemnification: Lessee shall indemnify Lessor against, and hold Lessor harmless from, any and all claims, actions, suits, proceedings, costs, expenses, damages, and liabilities, including reasonable attorneys' fees arising out of, connected with, or resulting from the Equipment, including without limitation the manufacture, selection, delivery, possession, use, operation or return of the Equipment; provided that any indemnity for taxes paid by Lessor shall be in accordance with Sections 5.1, 5.2 and 8.4 hereof. Each party agrees that it will give the other prompt notice of the assertion of any such claim or the institution of any such action, suit or proceeding.
To secure payment of its obligations under the lease, Tiger granted petitioner a security interest in Tiger's rights in the equipment, and Tiger executed a collateral *342 assignment of its rights under the lease with ConEd, and any other sublessee, in favor of petitioner. In turn, petitioner gave Elmco a collateral interest in the equipment, the lease with Tiger, and the collateral lease assignment petitioner received from Tiger to secure his obligation to make payments under the notes. Concurrent with the purchase of the equipment, petitioner and Tiger entered into a remarketing agreement in which Tiger undertook to sell or lease the equipment on petitioner's behalf. Tiger previously had contracted with International Leasing Service (ILS) to provide remarketing services for petitioner's computer equipment. On December 21, 1981, petitioner, Elmco, Tiger, and Manufacturers Hanover Trust Company (Manufacturers) entered into a depository agreement irrevocably appointing Manufacturers the agent for receiving and disbursing funds owed by and between the parties to the 1981 transaction. Under such agreement, payments were made as follows: (a) Rental payments were made by Tiger to an account; (b) petitioner was credited with Tiger's payments; (c) petitioner was debited for payments to Elmco on petitioner's installment note; (d) Elmco was credited for *343 petitioner's installment note payments; (e) Elmco was debited for payments to Tiger on its installment note; and (f) Tiger was credited for Elmco's installment note payments. Petitioner timely paid the $ 18,000 cash and the three purchase money promissory notes called for under the December 21, 1981, agreement with Elmco. On August 19, 1985, petitioner consented to NER's assignment of all rights and duties relating to the 1981 transaction to Franchise Leasing Corporation (Franchise). Subsequently, Tiger went into bankruptcy, but payments on the lease continued to be made, so none of the parties to the 1981 transaction went into default. The payments petitioner received from Tiger or Franchise subsequent to December 1984 exceeded the payments due on the installment note by $ 358 per month. Petitioner received checks on a monthly or quarterly basis as payment of such differential amounts. Under petitioner's lease with Tiger, petitioner was entitled to receive 50 percent of the net re-lease proceeds for the period January 1986 through December 1988. Petitioner received supplemental rent payments totaling $ 56,063.86 for such period. Under the lease, petitioner was entitled to *344 receive 70 percent of the net re-lease proceeds for the period January 1989 through December 1990. For the period January 1989 through June 1990, petitioner received supplemental rent payments of $ 6,905.50. For the taxable years in issue, petitioners reported income and claimed deductions with respect to the 1981 transaction on their Federal income tax returns as follows: 1981
1982
1983
1984
Rental income
$1,889 $ 68,000 $ 68,000 $ 68,000 Depreciation
75,000 127,500 105,000 83,300 Interest expense
1,889 68,000 68,000 6,800 Net Loss
(75,000)
(127,500)
(105,000)
(22,100)
The 1984 Leasing Transaction
During 1984, Elmco and Butcher & Singer put together another computer equipment leasing transaction (the 1984 transaction) for petitioner. The 1984 transaction involved equipment owned by Greyhound Capital Corp. (Greyhound), one of the largest computer leasing companies in the industry. Butcher & Singer presented the 1984 leasing transaction to petitioner. Elmco's function in the 1984 transaction was similar to its role in the 1981 transaction. Elmco negotiated the documents and structure of the 1984 transaction, the selection of *345 the equipment and its price with Greyhound. Elmco did the same promotional work with Butcher & Singer as it had done in the 1981 transaction, worked out all of the numbers relating to the 1984 transaction, and worked jointly with attorneys to write the documents used in the 1984 transaction and the offering memoranda. An attorney for Butcher & Singer negotiated certain terms of the 1984 transaction with Greyhound. Changes were made in the documents as a result of such negotiations which were more favorable to investors, including petitioner, than had been the case in other transactions in which Greyhound had been involved. The attorney obtained Greyhound's agreement not to take a security interest in the equipment and to accept petitioner's notes to Elmco as security for the repayment of Elmco's debt to Greyhound. Greyhound also accepted a remarketing fee equal to the fair value of its services, rather than a percentage of the remarketing proceeds. Petitioner reviewed the 1984 transaction with his accountant. Petitioner's accountant reviewed certain of the documents involved in the 1984 transaction. Petitioner relied on his accountant's recommendations and the representations *346 made by Butcher & Singer in deciding whether to invest in the 1984 transaction. Petitioner also consulted with his attorney concerning his liability for the note evidencing the debt to be incurred as part of the 1984 transaction. Petitioner's experience with the 1981 transaction also influenced his decision to invest in the 1984 transaction. Petitioner's accountant analyzed the financial information regarding the 1984 transaction furnished to petitioner. Petitioner understood that such financial information showed that he would make a profit from his investment in the 1984 transaction. Petitioner's accountant considered the tax savings produced by the investment, as well as the return available from rents and residual value of the equipment. In making his projections, petitioner's accountant reviewed an appraisal of the equipment by Thomas J. Norris (the Norris appraisal), which was furnished as part of the documentation for the 1984 transaction. Petitioner also read and relied upon the Norris appraisal. The Norris appraisal put the fair market value of the equipment at the time of the 1984 transaction at $ 500,000 and its residual value at the end of the lease in 1992 at *347 $ 80,000, or 16 percent of its value at the time of the 1984 transaction. Information in the Norris appraisal, and in the supplemental private offering memorandum furnished to petitioner, projected that petitioner would receive $ 162,168 in supplemental rents, which represented a sharing of the equipment's rental income in the last 4 years of the lease, and which were in addition to the rent payments called for in the master lease with Greyhound. To calculate the rentals which the equipment could be expected to generate during the last 4 years of the lease, the Norris appraisal assumed that annual rent would equal 40 percent of the equipment's fair market value in such year. Prior to entering the 1984 transaction, petitioner executed a Subscription Request Form subscribing to purchase $ 500,000 worth of equipment to be selected by Elmco. In such document, petitioner stated that his objectives in entering the 1984 transaction were "cash flow & tax benefits". On October 16, 1984, Elmco purchased the following computer equipment from Greyhound: Quantity
IBM Model Number
Description
3
3370-A11
Direct Access Storage
2
3370-B01
Direct Access Storage
8
3375-B01
Direct Access Storage
1
3380-B04
Direct Access Storage
4
3262-B01
650 LPM Printer
1
3262-003
650 LPM Printer
*348 Elmco paid Greyhound $ 462,000, consisting of $ 6,000 in cash, four nonrecourse equity promissory notes totaling $ 66,500, and a nonrecourse promissory note in the amount of $ 390,000. The $ 390,000 nonrecourse note was for a term of 96 months, with payments of $ 6,563.30 per month for the first 50 months and payments of $ 7,859.98 for the next 46 months. Concurrent with the Purchase Agreement, Greyhound and Elmco executed a Collateral Assignment Agreement in which Elmco assigned to Greyhound certain rights in the equipment and petitioner's notes to Elmco. On October 16, 1984, petitioner purchased the equipment from Elmco, paying $ 500,000 as follows: $ 17,300 cash, four equity promissory notes totaling $ 92,700 bearing a simple interest rate of 14.5 percent, and a "Buyer Acquisition Note" of $ 390,000 bearing interest at 15 percent. The interest payable on the equity notes totaled $ 24,189. Petitioner paid, with interest, the equity notes. As with the Elmco/Greyhound note, the Buyer Acquisition Note was for a term of 96 months, with 50 monthly payments of $ 6,563.30, followed by 46 monthly payments of $ 7,859.98. Both notes called for an interim payment of $ 2,404.05 on October *349 31, 1984. Concurrent with the purchase of the equipment, a Security Agreement was executed between petitioner and Elmco. To secure payment and performance by petitioner of all his obligations and liabilities, petitioner granted Elmco a security interest in the equipment, including the rents and profits therefrom and all his rights under the Greyhound lease. Concurrent with the purchase of the equipment, petitioner leased the equipment to Greyhound. The lease was for approximately 8 years, and ended October 31, 1992. The lease was a net lease and allowed the lessee to sublease the equipment, as well as substitute equipment. At the time the lease was entered into, all of the equipment was subleased under either month-to-month leases or longer term leases. Petitioner's lease with Greyhound called for an interim fixed rent payment in the amount of $ 2,404.05 on October 31, 1984, and rental payments of $ 6,563.30 for the first 50 months of its term and of $ 7,859.98 for the remaining 46 months. The lease also provided that petitioner would share in the gross rental income, defined as total rents less sales and use taxes and contract maintenance fees paid by Greyhound, after the *350 48th month of the lease term. Petitioner was entitled to 85 percent of the gross rents until he received $ 116,000, and thereafter would receive 55.25 percent of gross rents through the end of the lease term. Petitioner received supplemental rent payments called for under the lease in a timely manner. At the time of trial, petitioner had received $ 32,669 in supplemental rents. To secure Greyhound's payment of rent and its other obligations under the lease, Greyhound granted petitioner a security interest in all its contract rights and proceeds from the underlying leases and, as lessee, to the equipment. Concurrent with the purchase of the equipment, petitioner and Greyhound entered into a Remarketing Agreement, in which petitioner irrevocably appointed Greyhound as his agent for remarketing the equipment. Petitioner agreed to pay Greyhound fair market value for its remarketing services, as well as its remarketing expenses. Such expenses were presumed to be equal to 15 percent of remarketing proceeds, plus sales and use taxes and contract maintenance expenses paid by Greyhound. No remarketing fees, however, were payable to Greyhound during the term of the lease with petitioner. *351 Petitioner, Greyhound, and Elmco entered into a depository agreement with First Interstate Bank of Arizona similar to the arrangement used in the 1981 transaction. For taxable year 1984, petitioners claimed income and deductions with respect to the 1984 transaction on their Federal income tax return as follows: Rental Income
$ 15,531  Depreciation
75,000 Interest Expense
12,133 Net Loss
$ (71,602)
Interest Income
In 1981 and 1983, petitioners maintained an interest-bearing checking account with the Second National Bank of Warren. Petitioners received $ 505.67 of interest from such account in 1983. No amount of interest income from such amount was reported on their 1981 or 1983 tax returns. Dividend Income
During 1983, petitioner and his father jointly owned stock in Ohio Edison. Petitioner obtained his interest in such stock as a gift from his father, and the two agreed that petitioner's father would receive the dividends paid on such stock. Dividends of $ 1,440 were paid with respect to such stock in 1983, and petitioner's father deposited them in his bank account. OPINION We discuss the issues in the instant case under four separate headings: *352 (1) The 1981 transaction; (2) the 1984 transaction; (3) issues connected with the taxes assessed prior to the issuance of the notice of deficiency; and (4) the additions to tax and increased interest. The 1981 Transaction
With respect to the 1981 transaction, we must decide whether, pursuant to section 465, petitioner was "at risk". Section 465 provides generally that losses occasioned by such an activity are deductible only to the extent that the taxpayer is "at risk" for such activity. Emershaw v. Commissioner, 949 F.2d 841, 844-845 (6th Cir. 1991), affg. T.C. Memo. 1990-246. A taxpayer is deemed to be "at risk" with respect to amounts of money the taxpayer contributes to an activity. Sec. 465(b)(1)(A). Consequently, we hold that petitioner is "at risk" with respect to the $ 18,000 he invested in the 1981 transaction. With respect to funds borrowed for use in the activity, a taxpayer is "at risk" to the extent he is personally liable for repayment of such borrowing. Sec. 465(b)(2)(A). A taxpayer is "personally liable" for purposes of section 465(b)(2)(A) if he has ultimate financial responsibility for repayment of the loan if income *353 from the investment is insufficient. Thornock v. Commissioner, 94 T.C. 439, 448 (1990); Krause v. Commissioner, 92 T.C. 1003, 1017 (1989); Levy v. Commissioner, 91 T.C. 838, 863 (1988); Melvin v. Commissioner, 88 T.C. 63, 75-77 (1987), affd. per curiam 894 F.2d 1072 (9th Cir. 1990). In deciding where ultimate liability for the obligation rests, the substance of the transaction controls. Thornock v. Commissioner, supra at 448; Krause v. Commissioner, supra at 1017; Levy v. Commissioner, supra at 863; Melvin v. Commissioner, supra at 75. A taxpayer's perception that he is generally liable for a debt does not control the issue. Moser v. Commissioner, 914 F.2d 1040, 1050 (8th Cir. 1990), affg. T.C. Memo. 1989-142; Waters v. Commissioner, T.C. Memo. 1991-462. The scenario which controls for purposes of section 465(b)(2) is the worst-case scenario. Young v. Commissioner, 926 F.2d 1083, 1089 n.14 (11th Cir. 1991), affg. *354 T.C. Memo, 1988-440 and Cohen v. Commissioner, T.C. Memo. 1988-525; Moser v. Commissioner, supra at 1048; American Principals Leasing Corp. v. United States, 904 F.2d 477, 482 (9th Cir. 1990); Thornock v. Commissioner, supra at 448. We previously have considered whether a taxpayer is "personally liable" for purposes of section 465(b)(2)(A) on a partially recourse installment note under circumstances essentially the same as the 1981 transaction in Cohen v. Commissioner, T.C. Memo. 1988-525, affd. sub nom. Young v. Commissioner, 926 F.2d 1083 (11th Cir. 1991). In Cohen, we found that the taxpayers were not personally liable on their installment note under the worst-case scenario on the following basis: The remote "worst-case scenario" here would be (1) that the sublessees [in the instant case, ConEd] ceased paying Tiger, (2) Tiger did not enforce payment from them, substitute another sublessee for the equipment, or pay the bank [in the instant case, MHLC] from its own funds, (3) the bank was unable to collect from Tiger or the sublessees *355 because of their inability to pay their debts or their bankruptcies, and (4) the bank distrained on and sold the equipment. Even under the "worst-case scenario," Tiger could still discharge its obligations for rental payments to the extent of petitioner's and CTC's [a subsidiary of Elmco which played the role taken by Elmco in the instant case] notes merely by crediting its rent through the Cohens over to CTC and back to itself. Since the circle was immediately completed "from Tiger back to Tiger," under no circumstances would this circular crediting have been required to cease. Even more importantly, if the rental payments ceased and the equipment was taken, CTC's note would in effect be discharged since it was a nonrecourse note which was guaranteed with a lien subordinate to the bank's lien. Under these circumstances, CTC would owe no indebtedness to Tiger, or if under the form of the setup it did, Tiger had the same indebtedness to it via its required lease payments to the Cohens, which the Cohens had assigned to CTC as security for payment on the installment note. In the purchase agreement, CTC had indemnified the Cohens from loss from any breach of the purchase agreement. *356 If the equipment sold by CTC to the Cohens was distrained upon so that it could not be available to the Cohens upon expiration of the lease, CTC would certainly not collect on a note to it when it was not paying its note to Tiger without violating its indemnity agreement. We have recited above how in our view even under the "worst-case scenario", the documents as they existed left no possibility of petitioners ever being required to pay any portion of their installment note to CTC other than through Tiger's rental payments. * * * [Cohen v. Commissioner, T.C. Memo. 1988-525.]
As we stated above, the 1981 transaction is, in nearly all material respects, the same as the transaction in issue in Cohen. We reach the same conclusion in the instant case as we did in Cohen and hold that petitioner is not personally liable on the $ 400,000 installment note given to Elmco as part of the purchase price of the equipment. Our conclusion in the instant case rests upon the premise that petitioner is not ultimately responsible for payment of the installment note as required by section 465(b)(2)(A) and, alternatively, that he is not "at risk" under section 465(b)(4) *357 because he is protected against loss through an arrangement similar to nonrecourse financing, guarantees, and stop-loss agreements. With respect to section 465(b)(2)(A), several considerations support our conclusion. Under the worst-case scenario, ConEd fails to make payments on its lease, which, under the agreement between Tiger and MHLC, must be used to repay MHLC's loan to Tiger and which ConEd paid directly to MHLC. Although the terms of such loan provide that it is nonrecourse, if Tiger fails to perform any agreement in the Loan and Security Agreement, MHLC could proceed directly against Tiger. Consequently, if Tiger fails to find another sublessee or fails to repay the loan from its own funds, MHLC could proceed directly against Tiger in addition to foreclosing on and selling the equipment. Even if MHLC were to proceed directly against Tiger, however, there is no reason to suppose that the circular flow of payments from Tiger to Elmco and back to Tiger would be affected. The only assets of Tiger's which might be available to satisfy MHLC's debt are petitioner's recourse equity notes, discussed infra, a collateral right to receive lease payments assigned by Elmco, to *358 which MHLC already has a right, and Elmco's nonrecourse installment note to Tiger. For the purpose of our analysis, we are concerned only with the installment note, as it forms part of the circular chain of payments sustaining the transaction. We have difficulty imagining that a creditor would attempt to levy on the note to satisfy Tiger's indebtedness. Elmco is fully insulated from any personal liability to Tiger or MHLC in the transaction, and the only remedy available against it is foreclosure on the equipment. Furthermore, under the terms of Elmco's installment note to Tiger, payment of the debt could not be accelerated without Elmco's written consent, even if Elmco defaults on its obligation. Consequently, if the circular payments were to be disrupted by MHLC's attempt to levy on Elmco's payments to Tiger, Elmco simply could stop its payments. MHLC then would have the choice of either foreclosing its security interest in the equipment, or waiting for each installment payment to come due, and then foreclosing Tiger's security interest in a portion of the equipment to satisfy the unpaid installment. In such a situation, a rational creditor simply would foreclose on its security *359 interest in the equipment in order to satisfy the debt and not bother with trying to collect on Elmco's nonrecourse note to Tiger. The absence of an effective acceleration provision in Elmco's note shows that recovery on the note in the event of default is not contemplated. Thus, as far as Elmco's installment note to Tiger is concerned, Tiger's debt to MHLC is essentially nonrecourse, and MHLC has no practical way to interfere with the circular payment arrangement. Consequently, the 1981 transaction is essentially the same as in Cohen. If the equipment were to be taken by MHLC, Elmco's obligation to Tiger in effect would be discharged, as it is a nonrecourse debt secured by a lien subordinate to MHLC's. We have no reason to suppose that Elmco would continue to pay its note to Tiger under such circumstances, as Elmco in effect would be assuming personal liability for its notes, which it carefully contracted to avoid at the inception of the transaction. Under such circumstances, if Elmco has no obligation to Tiger, Elmco would have no basis for collecting on its installment note from petitioner. Moser v. Commissioner, 914 F.2d 1040, 1049 (8th Cir. 1990), *360 affg. T.C. Memo. 1989-142; Young v. Commissioner, T.C. Memo. 1988-440, affd. 926 F.2d 1083 (11th Cir. 1991). We note that Mr. Meadows, president of Elmco, testified that he would proceed against petitioner on the installment note in the event of default, but, as in the other cases involving Elmco, we do not find such assertions to be plausible given the structure of the transaction. Young v. Commissioner, supra. Furthermore, the record in the instant case shows that the circular payment arrangement is immune to disruption, as the payments continued even when Tiger went bankrupt. As the worst-case scenario plays itself out, petitioner suffers no adverse consequences. In essence, Elmco's arrangements with Tiger and MHLC create a firewall which protects petitioner against ultimate responsibility for paying the installment note even if the investment fails. Petitioner's liability on his installment note runs only to Elmco, due to the fact that petitioner's installment note is nonnegotiable and has not been assigned to Tiger as security. That is in contrast to petitioner's equity notes, which Elmco has assigned to Tiger *361 to secure Elmco's note payments. Because Elmco is not personally liable on its notes, and simply could cease payments should Tiger quit paying on its lease, petitioner would not be called upon to pay his nominally recourse installment note. We note that the purchase agreement between Elmco and petitioner contains an indemnity provision identical to the one in Cohen. In Cohen, we found that, if the security interest in the equipment had been foreclosed upon and the Elmco subsidiary did not make payments on its own note, the Elmco subsidiary which sold the equipment to the taxpayer could not have proceeded to collect on the installment note from the taxpayer without violating the indemnity agreement with the taxpayer. Similarly, in the instant case, under the worst-case scenario, Elmco could not collect on petitioner's installment note without violating the indemnity provision in the purchase agreement. Petitioner therefore does not have ultimate responsibility for payment of the installment note, and accordingly is not personally liable on it within the meaning of section 465(b)(2). In prior cases dealing with equipment leasing transactions engineered by Elmco, we found *362 that the substance of the transactions was that the taxpayers merely assumed Elmco's nonrecourse liabilities to Tiger, and the taxpayers' liabilities were secondary to Elmco's. Cohen v. Commissioner, T.C. Memo. 1988-525, affd. sub nom. Young v. Commissioner, 926 F.2d 1083 (11th Cir. 1991); Lamb v. Commissioner, T.C. Memo 1988-501; Young v. Commissioner, T.C. Memo. 1988-440, affd. 926 F.2d 1083 (11th Cir. 1991). We make findings similar to those cases in the instant case. Petitioner's installment note to Elmco has the same term, interest rate and repayment schedule as Elmco's $ 400,000 installment note to Tiger. Furthermore, Elmco's purchase of the equipment from Tiger and its resale to petitioner occurred simultaneously. As we noted in Cohen, Lamb, and Young, the apparent reason that the transactions took the form they did was to make them provide "window dressing" designed to create the appearance that the taxpayers were "at risk" with respect to the nominally recourse portion of the installment note. Young v. Commissioner, 926 F.2d at 1089; Burns v. Commissioner, 78 T.C. 185, 211-212 (1982); *363 see also Moser v. Commissioner, T.C. Memo. 1989-142, affd. 914 F.2d 1040 (8th Cir. 1990). In the instant case, we think the 1981 transaction took the form it did for the same reason, i.e., for "window dressing" to create the appearance that petitioner was "at risk" on the installment note. In contrast, we hold that petitioner was personally liable on the three purchase money recourse notes totaling $ 82,000 given to Elmco by petitioner as part of the consideration for the equipment. Under the "worst-case scenario", the rental payments from Tiger would not be sufficient to cover petitioner's obligation to repay such notes, and petitioner would be required to use his own funds, as opposed to funds generated by the investment, to repay the notes. Indeed, petitioner had to use his own funds to repay the notes even when the payments from Tiger were being made according to the terms of the deal. Furthermore, Elmco assigned the notes to Tiger to secure Elmco's repayment of the notes it gave Tiger for the equipment. If Elmco defaults on its debt to Tiger, Tiger could require petitioner to pay off the notes. Petitioner has ultimate liability with *364 respect to such notes if Elmco goes bankrupt and is unable to reimburse petitioner under the terms of the indemnity agreement between them. We therefore hold that petitioner is ultimately liable for repayment of the purchase money notes and is "at risk" with respect to them. See Cohen v. Commissioner, T.C. Memo. 1988-525, affd. sub nom. Young v. Commissioner, 926 F.2d 1083 (11th Cir. 1991); Lamb v. Commissioner, T.C. Memo. 1988-501; Young v. Commissioner, T.C. Memo. 1988-440, affd. 926 F.2d 1083 (11th Cir. 1991). With respect to section 465(b)(4), we reach an alternate holding that petitioner is not "at risk" with respect to the installment note. Section 465(b)(4) provides that, even if a taxpayer is nominally personally liable on indebtedness, he is not "at risk" for "amounts protected against loss through non-recourse financing, guarantees, stop loss agreements, or other similar arrangements." This Court, as well as the Circuit Courts for the Eighth, Ninth, and Eleventh Circuits, has held that an arrangement which, by whatever method, effectively immunized investors from any realistic *365 possibility of suffering an economic loss, even though the underlying transaction is not profitable, falls within the scope of section 465(b)(4). Young v. Commissioner, 926 F.2d at 1088; Moser v. Commissioner, 914 F.2d at 1048; Casebeer v. Commissioner, 909 F.2d 1360, 1369 (9th Cir. 1990), affg. on this issue Larsen v. Commissioner, 89 T.C. 1229 (1987); American Principals Leasing Corp. v. United States, 904 F.2d 477, 483 (9th Cir. 1990); [2]Thornock v. Commissioner, 94 T.C. 439, 448-449 (1990); Porreca v. Commissioner, 86 T.C. 821, 838 (1986). The Sixth Circuit, however, recently has held that, for an arrangement to fall within the scope of section 465(b)(4), there must be in existence an express collateral *366 agreement protecting the taxpayer from loss after the losses have occurred. Emershaw v. Commissioner, 949 F.2d 841, 849 (6th Cir. 1991), affg. T.C. Memo. 1990-246. Inasmuch as an appeal in the instant case would be taken to the Sixth Circuit, we apply its views in applying section 465(b)(4). Under Emershaw's interpretation of section 465(b)(4), we find that petitioner is expressly protected against loss by an arrangement within the intendment of that section. As a part of the 1981 transaction, petitioner received indemnity agreements from Tiger and Elmco. As a part of the leaseback of the equipment, Tiger must indemnify petitioner for any loss he incurs by reason of Tiger's failure to discharge its obligations under the lease and which causes petitioner to lose Federal tax benefits arising from ownership of the equipment. Furthermore, Tiger must indemnify petitioner for any liabilities arising out of, connected with, or resulting from the equipment. Such indemnity agreements provide petitioner with considerable protection against loss occasioned by Tiger's actions. Consequently, if Tiger fails to ensure that MHLC's debt is paid and MHLC *367 takes the equipment, Tiger is liable to make good the losses petitioner suffers as a result of the failure. Similarly, if Tiger fails to make its lease payments, petitioner has a claim against Tiger for any loss to petitioner occasioned by such failure. Furthermore, under the purchase agreement between Elmco and petitioner, Elmco must indemnify petitioner for any loss arising from Elmco's failure to abide by the provisions of the purchase agreement. Consequently, if Elmco stops paying on its installment obligation to Tiger and Tiger takes the equipment, petitioner has a claim against Elmco for any loss occasioned to petitioner by such action. Accordingly, we hold that the indemnity agreements in petitioner's favor expressly created an "other similar arrangement" protecting petitioner against loss on the installment note within the intendment of section 465(b)(4). The indemnity agreements do not create such an arrangement with respect to the recourse equity notes as their repayment is not connected with obligations to be performed by the other parties to the transaction. Accordingly, petitioners are "at risk" under section 465(a) with respect to the cash and recourse equity notes, *368 but not with respect to the installment note. The 1984 Transaction
The next issue to be decided is whether the 1984 transaction is to be respected for Federal tax purposes. Respondent contends that the 1984 transaction is a sham, lacking in both economic substance and business purpose. Petitioners contend otherwise. A transaction will not be respected if it is either a factual sham or a sham in substance. Kirchman v. Commissioner, 862 F.2d 1486, 1492 (11th Cir. 1989), affg. Glass v. Commissioner, 87 T.C. 1087 (1986). A "factual sham" is a fictitious transaction which serves no other purpose than the generation of tax deductions or other tax benefits. Lerman v. Commissioner, 939 F.2d 44, 48 n.6 (3d Cir. 1991), affg. T.C. Memo. 1988-570; Freytag v. Commissioner, 89 T.C. 849, 876-877 (1987), affd. 904 F.2d 1011 (5th Cir. 1990), affd. on another issue 501 U.S.    , 111 S. Ct. 2631 (1991); Brown v. Commissioner, 85 T.C. 968, 1000 (1985), affd. sub nom. Sochin v. Commissioner, 843 F.2d 351 (9th Cir. 1988); *369 Forseth v. Commissioner, 85 T.C. 127, 165 (1985), affd. sub nom. Mahoney v. Commissioner, 808 F.2d 1219 (6th Cir. 1987). Respondent concedes in the instant case that the 1984 transaction was not fictitious and that petitioner owned the equipment for all purposes under the Code. Petitioners contend that such concession disposes of the sham issue and that respondent may not argue that the 1984 transaction should be disregarded due to a lack of profit objective or economic substance. We disagree. Even if a transaction is not a factual sham, the transaction still may be a sham in substance. Gilman v. Commissioner, 933 F.2d 143, 148 (2d Cir. 1991), affg. T.C. Memo. 1989-684; Keane v. Commissioner, 865 F.2d 1088, 1091-1092 (9th Cir. 1989), affg. Glass v. Commissioner, 87 T.C. 1087 (1986). The parties have stipulated that the sole issue with respect to the 1984 transaction is "whether that transaction should be recognized for tax purposes". We think the statement of the issue is sufficiently broad to place the question of whether the 1984 transaction is a sham in substance *370 before the Court. Cannon v. Commissioner, 949 F.2d 345, 348-349 (10th Cir. 1991), affg. T.C. Memo. 1990-148. Accordingly, we will consider respondent's argument that the 1984 transaction is a sham in substance. This Court has held that a "sham in substance" consists of "the expedient of drawing up papers to characterize transactions contrary to objective economic realities and which have no economic significance beyond expected tax benefits." Falsetti v. Commissioner, 85 T.C. 332, 347 (1985); see also Kirchman v. Commissioner, 862 F.2d at 1492 ("transactions whose sole function is to produce tax deductions are substantive shams"). The substance of a transaction, not its form, however, governs its tax consequences, and courts must look beyond labels and self-serving declarations when applying Federal tax law. Schiff v. United States, 942 F.2d 348, 352 (6th Cir. 1991). A transaction must possess economic substance before Internal Revenue Code provisions allowing deductions will apply to it. Lerman v. Commissioner, 939 F.2d at 52. As the Sixth Circuit, the court *371 to which an appeal in the instant case would be taken, has put it: What tax statutes do not intend is that taxpayers cast transactions in forms so as to come within their provisions when in fact there is no substance behind the use of the forms, when the transaction is but a sham, or when the economic reality of the transaction does not comport with the form. [Davis v. Commissioner, 585 F.2d 807, 811-812 (6th Cir. 1978), affg. 66 T.C. 260 (1976); citations omitted.]
The Sixth Circuit has also made clear: (1) that claimed deductions may properly be disallowed by the IRS even though the relevant transactions actually occurred as represented by the taxpayer, and (2) that non-tax economic substance must inhere in the relevant transactions before loss deductions will be allowed. [Keats v. United States, 865 F.2d 86, 88 (6th Cir. 1988).]
The Sixth Circuit views the question as a factual inquiry. Ratliff v. Commissioner, 865 F.2d 97, 98 (6th Cir. 1989), affg. Glass v. Commissioner, 87 T.C. 1087 (1986). In Rose v. Commissioner, 868 F.2d 851, 853 (6th Cir. 1989), *372 affg. 88 T.C. 386 (1987), the Sixth Circuit stated the framework for the sham analysis as follows: The proper standard in determining if a transaction is a sham is whether the transaction has any practicable economic effects other than the creation of income tax losses. A taxpayer's subjective business purpose and the transaction's objective economic substance may be relevant to this inquiry. [Citations omitted.]
A transaction must possess economic substance if it is to be respected for tax purposes, and a subjective intent to make a profit is insufficient to cause a transaction to be recognized where such substance is lacking. Gardner v. Commissioner, 954 F.2d 836 (2d Cir. 1992), affg. Fox v. Commissioner, T.C. Memo. 1988-570; Lerman v. Commissioner, supra at 55; Kirchman v. Commissioner, supra at 1492; Mahoney v. Commissioner, 808 F.2d 1219, 1220 (6th Cir. 1987), affg. Forseth v. Commissioner, 85 T.C. 127 (1985); Cherin v. Commissioner, 89 T.C. 986, 993-994 (1987). According to the Sixth Circuit, economic *373 substance is a threshold requirement to an inquiry into a taxpayer's subjective business purpose. Bryant v. Commissioner, 928 F.2d 745, 748 (6th Cir. 1991), affg. in part and revg. in part T.C. Memo. 1989-527; Rose v. Commissioner, supra at 853. Moreover, the Sixth Circuit appears to view the objective economic substance component of the analysis simply as a means to screen out abusive tax-motivated transactions. In Bryant v. Commissioner, supra at 749, the Sixth Circuit held that the economic substance requirement was "designed to winnow out the most abusive tax shelters without engaging in the more difficult question of whether a transaction was profit motivated." The determinative factor in such an inquiry is whether or not the taxpayer made a bona fide investment or simply purchased tax deductions. Bryant v. Commissioner, supra.In Bryant, the Sixth Circuit found that the test was met where the taxpayer invested in an operating enterprise and considered the investment in a businesslike manner. Several factors which have been relied on in prior decisions of this *374 Court are useful in deciding the question of economic substance. Such factors include: (1) The relationship of the sales price to the fair market value of the equipment; (2) the presence or absence of arm's-length price negotiations; (3) the structure of the financing; and (4) the reasonableness of the income and residual value projections. Levy v. Commissioner, 91 T.C. 838, 856 (1988). Further, we think that consideration of whether there is a realistic opportunity to obtain a financial return on the 1984 transaction is helpful to our analysis. Rose v. Commissioner, supra at 854. Whether the investment is bona fide or a sham is decided as of the time of the transaction, and not on the basis of hindsight. Gilman v. Commissioner, 933 F.2d at 149; Bryant v. Commissioner, supra at 749. The evidence shows that petitioner paid $ 500,000 for the equipment, the value placed upon it by the Norris appraisal, which petitioner reviewed prior to entering into the transaction. Petitioners' expert, Esmond Lyons, also valued the equipment at $ 493,351. Mr. Lyons started with the used equipment prices *375 in the October 1984 Computer Merchants Blue Book. Although such issue of the Blue Book was not available as of the October 16, 1984, date of transaction, Mr. Lyons believes that use of such source is appropriate because the equipment values quoted by the October 1984 issue of the Blue Book were lower than those in the July 1984 issue of the Blue Book, and so yielded a more conservative estimate of value. We also note that the prices quoted in the October Blue Book were probably closer to the actual market value of the equipment at the time of the 1984 transaction than the date in the July issue, which was several months old at the time of the transaction. [3] Mr. Lyons then added a 15-percent premium over "Blue Book" value because the equipment had already been leased and was generating income when it was acquired. Mr. Lyons testified that such a premium was customary to reflect the additional value of equipment which is installed and generating rental income. In other cases, we have approved the use of a premium in valuing equipment under lease. Mukerji v. Commissioner, 87 T.C. 926, 948 (1986); Moser v. Commissioner, T.C. Memo. 1989-142, *376 affd. 914 F.2d 1040 (8th Cir. 1990); Lansburgh v. Commissioner, T.C. Memo. 1987-491. While respondent contends that such premium is at the upper limit of the range customarily applied, [4] we do not find it exaggerated or unreasonable. Respondent's expert, Donald McEwen, valued the equipment at $ 428,800. The difference between such value and the value found by Mr. Lyons is attributable to Mr. McEwen's failure to include any premium taking account of the fact that the equipment was under lease when purchased. Because Mr. McEwen admitted that the owner would have to incure expenses in finding a lessee and installing equipment if it were not under lease, we find that Mr. McEwen's failure to figure in a premium caused him to undervalue the equipment. Accordingly, we find that petitioner paid fair market value for the equipment when he entered into the 1984 transaction, which suggests that the 1984 transaction possessed economic substance. *377 We next consider whether there was arm's-length bargaining between the parties to the 1984 transaction, or whether petitioner simply accepted the terms offered by the investment promoters without question. The former suggests the presence of economic substance, while the latter suggests the taxpayer was motivated by tax, not business, considerations. Levy v. Commissioner, 91 T.C. 838, 856-857 (1988); Rose v. Commissioner, 88 T.C. 386, 419 (1987), affd. 868 F.2d 851 (6th Cir. 1989). In the instant case, the record does not show that there was any bargaining by petitioner over the price to be paid for the equipment. Elmco and Greyhound, however, worked to assemble a package of equipment that would have a value commensurate with the purchase price paid by petitioner. Because we have found that the price paid by petitioner reflected the fair market value of the equipment at the time the 1984 transaction was entered into, we do not find the absence of bargaining over the price to be paid by petitioner is suggestive of an economic sham, as might be the case if the price paid was inflated compared to the property's market value. *378 See Helba v. Commissioner, 87 T.C. 983, 1005-1007 (1986), affd. without published opinion 860 F.2d 1075 (3d Cir. 1988); Abramson v. Commissioner, 86 T.C. 360, 370-372 (1986). Furthermore, bargaining over other terms of the 1984 transaction took place before it was concluded. Butcher & Singer's attorney, on behalf of petitioner and other investors, negotiated with Greyhound, resulting in some modification of the terms on which petitioner acquired the equipment. As a result of such negotiations, Greyhound did not take a security interest in the equipment to secure Elmco's notes, but instead received a pledge of the investors' equity and acquisition notes. Additionally, the attorney obtained Greyhound's agreement to accept a remarketing fee equal to the fair value of its services, rather than a percentage of the remarketing proceeds. As a result of the negotiations, petitioner and the other investors represented by Butcher & Singer obtained more favorable terms than had been granted in Greyhound's other transactions. As we view the evidence in the instant case, we believe that the 1984 transaction is the product of arm's-length *379 negotiations by unrelated parties. Accordingly, the instant factor indicates that the 1984 transaction possesses economic substance. We next turn to the structure of the financing used in the transaction. The use of deferred debt which is not likely to be paid indicates that a transaction lacks economic substance. Rose v. Commissioner, supra at 419-420. Even if notes are nominally recourse, they will not be treated as creating genuine indebtedness if the surrounding circumstances suggest they were unlikely to be enforced. Patin v. Commissioner, supra at 1122-1124, affd. sub nom. Gomberg v. Commissioner, 868 F.2d 865 (6th Cir. 1989), affd. without published opinion 865 F.2d 1264 (5th Cir. 1989), affd. sub nom. Skeen v. Commissioner, 864 F.2d 93 (9th Cir. 1989), affd. without published opinion sub nom. Hatheway v. Commissioner, 856 F.2d 186 (4th Cir. 1988). The facts of the instant case, however, indicate that the transaction possesses economic substance. Petitioner financed his purchase by a cash downpayment and recourse obligations. The record indicates that his notes *380 are enforceable, and that the parties regard the debt incurred as part of the 1984 transaction as real. Such downpayment and debt equals the purchase price of the equipment, which reflects its fair market value. The terms of the debt instruments are commercially reasonable, and all parties made the payments required under the various promissory notes and lease agreements. Levy v. Commissioner, 91 T.C. at 857. We next consider whether the projections of supplemental rents and residual values are reasonable, and whether the 1984 transaction offers a realistic opportunity for profit, aside from tax benefits. Rose v. Commissioner, 868 F.2d 851, 854 (6th Cir. 1989) (quoting 88 T.C. 386, 405 (1987)); Levy v. Commissioner, supra at 856. Petitioner invested $ 110,000 of his own money in the 1984 transaction, consisting of $ 17,300 in cash and four equity promissory notes in the principal amount of $ 91,700. Additionally, the funds to pay the interest of $ 24,189 on the equity notes came from petitioner, which must be included in figuring petitioner's investment. Casebeer v. Commissioner, 909 F.2d 1360, 1366 (9th Cir. 1990), *381 affg. in part and revg. in part Larsen v. Commissioner, 89 T.C. 1229 (1987); Emershaw v. Commissioner, T.C. Memo. 1990-246, affd. on another issue 949 F.2d 841 (6th Cir. 1991). Consequently, to have a realistic possibility of yielding a profit, the transaction has to yield more than $ 134,189, considering supplemental rents and residual value. The Norris appraisal stated that the residual value of the equipment at the end of the lease term would be $ 80,000. The Norris appraisal calculated the value of the equipment in each year by multiplying the sale price by a percentage and assumed that the equipment would retain 16 percent of its value at the end of the lease. The Norris appraisal projected that the total rent received in the last 4 years of the lease, during which petitioner would be allowed to share in the gross rents received, would equal $ 220,000. Based on the arrangement, under which petitioner would share in supplemental rents, the Norris appraisal's income projection meant that petitioner could expect to receive $ 162,168 in income. [5] Such figure was used for the income projections in the supplemental offering *382 memorandum reviewed by petitioner prior to entering into the 1984 transaction. The Norris appraisal used the residual values calculated for the equipment to project the rental income which might be received during the period 1988 through 1992, when petitioner would share the rental income generated by the equipment. He estimated that the equipment could be expected to yield rental income equal to its fair market value in 30 months, or, that a year's rental income is equal to 40 percent of its value. To support their contentions regarding the objective reasonableness of profit opportunity, the parties submitted expert evidence concerning the residual value and supplemental rents which the equipment could have been expected to yield at the time of the transaction. Respondent's expert, Mr. McEwen, *383 calculates that the maximum supplemental rents and residual value which petitioner could expect to receive during the term of the lease was $ 117,078, consisting of $ 116,597 of rental income and $ 481 of residual value. Mr. McEwen also notes that expenses connected with remarketing the equipment could reduce the amount of supplemental rents, but he acknowledges in his report that as long as the equipment is covered under the lease with Greyhound, such expenses would not directly affect petitioner's income. [6] Mr. McEwen states that the maximum rental figure assumed the equipment would be under constant lease, which could also cause the figure to overstate supplemental rentals. Mr. McEwen does not attempt to arrive at a figure which takes into account such factors. Mr. McEwen also attempts to show that the transaction would lose money when analyzed on a present value basis. *384 Mr. McEwen's report contains certain flaws which diminish its persuasiveness. Mr. McEwen misidentifies two models of equipment in the transaction and consequently bases his valuation on equipment petitioners did not purchase. In attempting to assess what a reasonable person would have considered to be the useful life of petitioners' equipment at the time of the transaction, Mr. McEwen uses projections which disregard his own definitions of when equipment becomes obsolete. Mr. McEwen's projections depend upon accurate projection of residual value upon such life, and in turn bases his projection of supplemental rents upon such residual value. Mr. McEwen, however, understates the useful lives of the equipment, and consequently understates the amount of rental income and residual value of the equipment. Mr. McEwen's projection shows the useful lives of peripheral equipment shortening, when, in the opinion of other experts, including petitioners' expert, Mr. Lyons, such life is lengthening. Mr. Lyons testified that most peripheral equipment has a longer life than mainframe computers, that the pace of technological change in disks and printers was slowing, and that equipment of *385 the type petitioner purchased is holding its value better than equipment of the previous generation, all of which indicates that the useful life of peripheral equipment is lengthening. Consequently, we think that Mr. McEwen understates the residual value of the equipment over the term of the lease. To estimate future supplemental rents, Mr. McEwen uses a rule of thumb which holds that computer equipment could be expected to yield 90 percent of its value in rental income over 36 months. Because residual value is understated, future rental income would be understated as well. Petitioner's expert, Mr. Lyons, calculates a range of values for the supplemental rents and residual value of the equipment which could have been expected when the 1984 transaction was entered into. Mr. Lyon's report states that his projections of residual value were based on data available at the time the 1984 transaction was entered into and that methodologies similar to one developed for the "SRI residual value curves" have been employed in making his valuation. Mr. Lyons testified that he developed his projection of the rental income stream by considering the point in the equipment's life cycle when the *386 rent is to be earned, the difference in the equipment's value at the beginning and end of a lease term, the prime rate at the time, and appropriate industry values for the periods in question. Mr. Lyons' report produces a range of values within which future rental income is projected to fall. His report provides the following range of total residual value and total supplement rent as of the end of the lease: $ 69,493 to $ 195,672. Mr. Lyons, however, appears to incorrectly apply the rent-sharing formula specified in the master lease, resulting in his understatement of the amount of rents which petitioner would receive from Greyhound. [7] Because such error can be corrected on the basis of undisputed evidence in the record, and does not affect Mr. Lyons' conclusions as to the overall amount of rental income generated by the equipment, we will consider Mr. Lyons' projections based on the correct computations. Anselmo v. Commissioner, 80 T.C. 872, 884-885 (1983), affd. 757 F.2d 1208 (11th Cir. 1985). Applying the proper percentages to Mr. Lyons' projections, the expected range of income from residual value and supplemental rents is between $ 69,493 *387 and $ 205,462.[8] Respondent suggests that a prudent investor would base his expectation on the value at the midpoint of such range, which is $ 137,478. We note that such figure exceeds petitioner's $ 134,189 out-of-pocket investment in the transaction. Respondent argues that Mr. Lyons' projections of gross rentals received do not take account of deductions for sales and use taxes or maintenance costs paid by Greyhound on account *388 of the equipment which, under the master lease, were to be deducted from gross rents before petitioner's share was calculated. While the record does not establish that Greyhound actually paid such charge, we do not find that a reduction in petitioner's rental receipts caused by such charges is so great as to deprive the transaction of a realistic opportunity for profit. In summary, based on Mr. Lyons' analysis, as adjusted, we find that petitioner had a realistic opportunity to earn a pretax profit in excess of his actual investment in the equipment at the time he entered into the 1984 transaction. Accordingly, we hold that the 1984 transaction possesses objective economic substance and was a bona fide investment. Having decided, as a threshold matter, that the 1984 transaction possesses economic substance, we will consider whether petitioner possessed the requisite profit objective in entering into it. Bryant v. Commissioner, 928 F.2d 745, 749 (6th Cir. 1991), affg. in part and revg. in part T.C. Memo. 1988-527. In determining whether a taxpayer intended to profit from an activity in which his participation was passive, we pay particular *389 attention to the taxpayer's prudence in acquiring the property and in assigning duties to third parties and to the taxpayer's activities in monitoring the performance of such duties as the enterprise progressed. Flowers v. Commissioner, 80 T.C. 914, 923 (1983). Specifically, this Court has taken into account such factors as whether the taxpayer was knowledgeable of the industry, Sutton v. Commissioner, 84 T.C. 210, 224 (1985), affd. per curiam 788 F.2d 695, affd. sub nom. Knowlton v. Commissioner, 791 F.2d 1506 (11th Cir. 1986); whether he attempted to obtain valid information about the industry or research the feasibility of making a profit in a particular industry, Surloff v. Commissioner, 81 T.C. 210, 234-237 (1983); whether he ultimately relied upon the promoters of the shelter, Estate of Baron v. Commissioner, 83 T.C. 542, 555-556 (1984), affd. 798 F.2d 65 (2d Cir. 1986); and whether he spent any appreciable time or effort in monitoring his investment, Horn v. Commissioner, 90 T.C. 908, 936 (1988). The requisite standard is *390 actual and honest profit objective. Rose v. Commissioner, 868 F.2d 851, 854 (6th Cir. 1989), affg. 88 T.C. 386 (1987). Turning to the facts in the instant case, we hold that petitioner entered the 1984 transaction with an actual and honest profit objective. Petitioner approached the proposed transaction in a businesslike fashion. Petitioner reviewed the offering materials and consulted with his accountant to determine whether the transaction presented an opportunity for profit. Petitioner also consulted with his attorney concerning his liability for the note he would sign as part of the transaction. Petitioner dealt with Greyhound, one of the largest companies in the computer leasing field. Petitioner arranged for First Interstate Bank of Arizona to handle the transfers of funds needed to pay off his notes to Elmco and receive rent from Greyhound. Petitioner had gained experience with computer leasing in the 1981 transaction and such experience aided him in deciding to enter the 1984 transaction. Although petitioner relied almost exclusively on the promoters of the investment for his information about it, he had dealt with them previously *391 and had confidence in them. Additionally, he checked the financial projections with his own accountant. Although the evidence shows that petitioner was mindful of the tax benefits associated with his investment, we do not view such circumstance as vitiating his objective of making a profit. Inasmuch as petitioners have shown that the 1984 transaction possessed economic substance and that petitioner had an actual and honest profit objective, we allow petitioner's deductions associated with the 1984 transaction. Amounts Assessed Prior to Issuance of Statutory Notice
Prior to the issuance of the statutory notice of deficiency, petitioners executed a waiver of restrictions on assessment with respect to certain items resulting in a deficiency of $ 6,177.82 for 1981 and $ 691.48 for 1983, which amounts respondent has assessed, but which appear to have been unpaid. In their petition, however, petitioners placed such items in issue, contending that respondent erred with respect to such determinations. We have previously ruled that we have jurisdiction to consider the merits of a taxpayer's claim under such circumstances, and, accordingly, we shall do so. Bowman v. Commissioner, 17 T.C. 681, 685-686 (1951); *392 Elco Construction Co. v. Commissioner, T.C. Memo. 1965-259. 1. National Drilling Program Ltd. #4
On their 1981 return, petitioners claimed a loss of $ 14,301 in connection with the National Drilling Program Ltd. #4 partnership, which respondent disallowed. On brief, petitioners allege that they properly and correctly reported all matters relating to such loss, but they have offered no evidence in support of their allegations. Petitioners, therefore, have failed to carry their burden of proof, and respondent's determination is sustained. 2. Unreported Interest Income
Respondent determined that, in 1981, petitioners received and failed to report $ 592 of interest received on an interest-bearing checking account maintained at the Second National Bank of Warren. Petitioners admit that such account was maintained during 1981, but contend that no interest was received with respect to it in such year. Petitioners offered no evidence, such as bank statements or a Form 1099, bearing on the issue of interest paid with respect to such account in 1981. Petitioners admit that such account paid interest income of $ 505.67 in 1983, apparently suggesting that *393 such amount constitutes the unreported income received on such account during the years in issue. Petitioners' returns for 1981 and 1983, however, do not reflect any income from such account. Accordingly, petitioners have failed to carry their burden of proof with respect to such determination for 1981. Rule 142(a). 3. Unreported Dividend Income
Respondent determined that, during 1983, petitioner received $ 1,440 of dividend income on stock in Ohio Edison owned jointly by petitioner and his father. Petitioner had acquired his interest in the stock by gift from his father, and, according to petitioner, the two agreed that petitioner's father would receive all the dividends paid on such stock. Tax liability for income from property follows ownership of such property. Redmon v. United States, 471 F.2d 687, 690 (6th Cir. 1972). Where property is held jointly by two persons, one half of the income generally is taxed to each. Tracy v. Commissioner, 70 F.2d 93 (6th Cir. 1934), revg. 25 B.T.A. 1055 (1932). Consequently, we hold that petitioners are taxable on one half of the dividends received on the stock in 1983, or *394 $ 720, notwithstanding the arrangement with petitioner's father. Helvering v. Horst, 311 U.S. 112 (1940); Corliss v. Bowers, 281 U.S. 376 (1930); Greer v. United States, 408 F.2d 631, 633 (6th Cir. 1969); Hyman v. Nunan, 143 F.2d 425, 427 (2d Cir. 1944), affg. 1 T.C. 911 (1943). Additions to Tax
1. Negligence Additions
Respondent determined that petitioners were liable for the negligence addition in each year in issue. Respondent's determination that petitioners were negligent is presumptively correct, and petitioners have the burden of showing that no part of the underpayments occuring in the years in issue is attributable to negligence. Jackson v. Commissioner, 86 T.C. 492, 539 (1986), affd. on other issues 864 F.2d 1521 (10th Cir. 1989); Bixby v. Commissioner, 58 T.C. 757, 791-792 (1972). For the years in issue, if any part of an underpayment in a year is attributable to negligence, the addition is imposed on the entire underpayment for such year. Commissioner v. Asphalt Products Co., 482 U.S. 117 (1987). *395 "Negligence is defined as a failure to exercise the due care that a reasonable and ordinarily prudent person would exercise under the circumstances." Antonides v. Commissioner, 91 T.C. 686, 699 (1988), affd. 893 F.2d 656 (4th Cir. 1990) (citing Marcello v. Commissioner, 380 F.2d 499, 506 (5th Cir. 1967)). A taxpayer, however, may defend himself against a determination that he was negligent by showing that he reasonably relied upon the advice of a qualified adviser in acting as he did. Ewing v. Commissioner, 91 T.C. 396, 423 (1988),affd. without published opinion 940 F.2d 1534 (9th Cir. 1991); Industrial Valley Bank & Trust Co. v. Commissioner, 66 T.C. 272, 283 (1976). Reliance on an expert is not an absolute defense, but is a factor to be considered. Freytag v. Commissioner, 89 T.C. 849, 888 (1987), affd. 904 F.2d 1011 (5th Cir. 1990), affd. on another issue 501 U.S.    , 111 S. Ct. 2631 (1991). A taxpayer's reliance must be in good faith and demonstrably reasonable. Ewing v. Commissioner, supra at 423; *396 Freytag v. Commissioner, supra at 888-889. In such a case, a taxpayer will be entitled to rely upon an expert's advice,even if such advice should prove to be erroneous. Jackson v. Commissioner, supra at 539; Brown v. Commissioner, 47 T.C. 399, 410 (1967), affd. 398 F.2d 832 (6th Cir. 1968). Turning to the facts in the instant case, we find that petitioners have not carried their burden of proof of or repudiating the negligence addition with respect to all of the taxable years in issue. With respect to the 1981 transaction, we find that petitioners have succeeded in showing that they were not negligent. Petitioner consulted with both his accountant and his attorney before entering into the transaction, and both advised him that he was personally liable on the notes executed as part of the transaction. Furthermore, petitioner's attorney reviewed the documents connected with the 1981 transaction and advised petitioner that he would be "at risk" on the promissory notes in the transaction. The record does not indicate that the advice given petitioner was unreasonable or was given by unqualified persons. *397 Epsten v. Commissioner, T.C. Memo. 1991-252. We accordingly find that petitioners were not negligent in claiming tax benefits in connection with the 1981 leasing transaction. [9]
Petitioners, however, have not carried their burden of proof with respect to the amounts of dividend and interest income omitted from their 1981 and 1983 returns. Petitioner was a successful, self-employed orthodontist, whose net worth increased from $ 1,000,000 to$ 1,250,000 during the years in issue, and his wife was the secretary-bookkeeper for his practice during the years in issue. Such income was clearly taxable to petitioners, and they have failed to explain why it was not reported on their returns. In *398 light of petitioners' background and expertise in financial matters and petitioners' failure to offer any explanation, we sustain respondent's determination of the negligence addition. [10]Little v. Helvering, 75 F.2d 436, 439 (8th Cir. 1935), affg. Hughes v. Commissioner, 27 B.T.A. 1022 (1933); Schirmer v. Commissioner, 89 T.C. 277, 287 (1987). Furthermore, petitioners have not offered any evidence to show that their claim of deductions on their 1981 return in connection with the National Drilling Program Ltd. #4 was not negligent. Accordingly, we sustain respondent's determination that petitioners are liable for the negligence addition with respect to their 1981 and 1983 taxable years. Petitioners, however, are not liable for the negligence addition for their 1982 and 1984 taxable years. *399 2. Substantial Understatement Additions
Respondent determined that petitioners were liable for the substantial understatement addition provided by section 6661 for petitioners' taxable years 1982 through 1984. Section 6661 provides that a taxpayer who substantially understates his tax for a year may be liable for an addition to tax of 25 percent of the underpayment of tax attributable to such understatement. Such section applies to income tax returns due after December 31, 1982, provided the addition is assessed after October 21, 1986. Pallottini v. Commissioner, 90 T.C. 498, 500-502 (1988). An understatement is substantial where it exceeds the greater of 10 percent of the tax required to be shown on the taxpayer's return or $ 5,000. Sec. 6661(b)(1)(A). The amount of the understatement, however, is reduced by amounts attributable to items for which there was substantial authority for the taxpayer's position, or where the taxpayer disclosed relevant facts concerning the item with his return. Sec. 6661(b)(2)(B). If, however, the understatement is attributable to a tax shelter, disclosure of the item will not enable the taxpayer to avoid the addition, *400 and the substantial authority test will not apply unless the taxpayer can show that he reasonably believed the treatment of the item causing the understatement was more likely than not proper. Sec. 6661(b)(2)(C). Petitioners argue that they are not liable for the substantial understatement addition. [11]
Respondent contends that the 1981 leasing transaction is a tax shelter. After due consideration, we find that the 1981 transaction is not a tax shelter under section 6661. The record in the instant case shows *401 that the principal purpose of the 1981 transaction was not the avoidance or evasion of Federal income tax. Sec. 6661(b)(2)(C)(ii). Petitioner and his advisers considered the economic aspects of the transaction before entering into it, and considered it a good investment based on the income it would generate aside from tax benefits. Respondent conceded that the 1981 transaction had economic substance and that petitioner had the requisite profit objective in entering into the transaction. While we held above that petitioner was not "at risk" on the 1981 transaction under section 465, such circumstance does not cause the transaction to be a tax shelter. Epsten v. Commissioner, T.C. Memo. 1991-252. Accordingly, as respondent does not argue that petitioners lack substantial authority for their return position in the absence of the transaction's being held a tax shelter, we hold that petitioners are not liable for the substantial understatement addition for the years in issue. 3. Increased Interest
Respondent determined that petitioners were liable for increased interest as provided by section 6621(c). Such subsection provides for increased interest on underpayments *402 in excess of $ 1,000 per year which are due to tax-motivated transactions. The increased rate applies to interest accruing after December 31, 1984, even if the transaction was entered into prior to the date of enactment of section 6621(c). Gantner v. Commissioner, 91 T.C. 713, 731 (1988), affd. 905 F.2d 241 (8th Cir. 1990); Solowiejczyk v. Commissioner, 85 T.C. 552 (1985), affd. without published opinion 795 F.2d 1005 (2d Cir. 1986). Section 6621(c)(3)(A)(ii) provides that any loss disallowed by reason of section 465(a) is attributable to a tax-motivated transaction. Section 6621(c)(4) confers jurisdiction on the Tax Court to determine the portion of the deficiency which is attributable to tax-motivated transactions. We have decided that certain of the losses claimed by petitioners in connection with the 1981 transaction are not allowable under section 465 because petitioner was not "at risk" on the limited recourse installment note given to Elmco. Consequently, if, for any taxable year in issue, the disallowance of such losses results in an underpayment in excess of $ 1,000, the increased interest rate *403 applies to such underpayment. Peters v. Commissioner, 89 T.C. 423, 443-444 (1987); Moser v. Commissioner, T.C. Memo. 1989-142, affd. 914 F.2d 1040 (8th Cir. 1990). To reflect the foregoing, Decision will be entered under Rule 155. Footnotes
1. Prior to the issuance of the notice of deficiency in the instant case, petitioners executed a Waiver of Restrictions on Assessment with respect to a deficiency in the amount of $ 6,117.82, which respondent has assessed. Petitioners have placed such amount in issue by alleging in their petition that respondent erred in determining such deficiency. ↩
2. Fifty percent of the interest due on $ 40,840.29. ↩
3. Fifty percent of the interest due on $ 62,199. ↩
4. Prior to the issuance of the notice of deficiency, petitioners executed a Waiver of Restrictions on Assessment with respect to a deficiency of $ 691.48, and respondent has assessed such amount. Petitioners have placed such amount in issue by alleging in their petition that respondent erred in making such determination. ↩
5. Fifty percent of the interest due on $ 53,070.50. ↩
6. Fifty percent of the interest due on $ 46,276.↩
1. Petitioner Louise A. Martuccio filed a joint return with petitioner James V. Martuccio during the taxable years in issue. References to "petitioner" in the instant case hereafter will denote petitioner James V. Martuccio.↩
2. Cited as "Baldwin v. United States" in Emershaw v. Commissioner, 949 F.2d 841, 845 (6th Cir. 1991), affg. T.C. Memo. 1990-246↩.
3. We note that, had Mr. Lyons used the July 1984 Blue Book, the results would have been even more favorable to petitioners, as the prices quoted therein were higher than those in the October 1984 issue. Using the price in the July issue would have been appropriate, as it was the most recent guide available at the time of the transaction. Mukerji v. Commissioner, 87 T.C. 926, 965 (1986). Petitioners attached the relevant pages of such Blue Book to their opening brief. Respondent objects in her reply brief that the July 1984 Blue Book has not been introduced in evidence; however, we may, under Fed. R. Evid. 201, take judicial notice of the price information contained therein. The value of the equipment using the July quotes was as follows: ↩
Number of Units
IBM Model
Used Equipment Price
Total
3
3370-A11
$ 28,400
$ 85,200 2
3370-B01
24,000  48,000
8
3375-B01
23,600  188,800
2
3380-B04
64,450  128,900
4
3262-B01
12,000  48,000
1
3263-003
12,500  12,500
Grand Total  $ 511,400
4. In other cases previously decided by this Court, experts have estimated the premium over market value generally at 5 to 15 percent. Levy v. Commissioner, 91 T.C. 838, 856 (1988) (5 percent); Mukerji v. Commissioner, 87 T.C. 926, 948 (1986) (10 to 15 percent); Moser v. Commissioner, T.C. Memo. 1989-142 (10 to 15 percent); Lansburgh v. Commissioner, T.C. Memo. 1987-491↩ (10 percent).
5. Such amount is calculated as follows: ↩
12 Months Beginning
Expected Monthly Income
Total for Year
1988
$ 5,667
$ 68,004 1989
4,163  49,956
1990
2,026  24,312
1991
1,658  19,896
Grand Total  $ 162,168
6. Petitioner signed a remarketing agreement with Greyhound which entitles Greyhound to charge petitioners a reasonable fee for services rendered in releasing the equipment, in addition to remarketing expenses. The agreement sets the remarketing expense at 15 percent of rental received from the remarketing transaction. Such fees are not to be charged, however, during the term of the master lease.↩
7. The master lease provided that petitioner was to receive 85 percent of gross rents received after Oct. 16, 1988, until $ 116,000 was received, and thereafter he was to receive 55.25 percent of gross rents. Mr. Lyons' calculation was based on the assumption that the second phase called for payments equal to 55.25 percent of 85 percent instead of 100 percent of the gross rent. ↩
8. Such range is calculated based on a projection that the equipment would be worth between $ 0 and $ 24,198 at the end of the lease in 1992 and that supplemental rentals would range between $ 69,493 and $ 181,264.↩
9. We have declined to sustain imposition of the negligence addition in cases involving similar purchase and leaseback transactions where deductions were disallowed under section 465. Shea v. Commissioner, T.C. Memo. 1991-518; Epsten v. Commissioner, T.C. Memo. 1991-252↩.
10. We note that, in the case of failure to report interest and dividends reported to a taxpayer on an information return, sec. 6653(g) limits imposition of the negligence addition to the underpayment resulting from such failure. The Interest and Divident Tax Compliance Act of 1983, Pub. L. 98-67, sec. 1206, 97 Stat. 369, 382, however, provides that such limitation applies only with respect to payments made after December 31, 1983, and so sec. 6653(g) does not apply to the omitted dividends and interest in the instant case.↩
11. Petitioners make no argument with respect to the understatement attributable to the dividend income omitted from their 1983 return in disputing respondent's determination, and we will deem petitioners to have conceded that the understatement attributable to such item is properly taken into account in deciding whether petitioners are subject to the sec. 6661 addition. The understatement resulting from such omission, however, is by itself not sufficient to reach the threshold set by sec. 6661(b)(1)(A).↩